IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,836






WALTER ALEXANDER SORTO, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 921805 IN THE 184TH DISTRICT COURT

HARRIS COUNTY






 COCHRAN, J., delivered the opinion of the Court in which Keller, P.J.,
Price, Womack, Johnson, Keasler, Hervey and Holcomb, JJ., joined. Meyers,
J., not participating.



 Appellant was convicted in November 2003 of capital murder. (1) Pursuant to the jury's
answers to the special issues during the punishment stage, (2) the trial court sentenced appellant
to death. (3) Direct appeal to this Court is automatic. (4) Appellant raises sixteen points of error. 
We will affirm. 

Sufficiency of the Evidence 


 In his second point of error, appellant argues that the evidence is legally insufficient
to prove that he intended to kill the victims. When evaluating the legal sufficiency of the
evidence, we view the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. (5) 

 Appellant was indicted for intentionally and knowingly causing the deaths of Maria
Rangel and Roxana Capulin by shooting them with a firearm during the same criminal
transaction. (6) The charge authorized the jury to convict appellant on any of three theories of
capital murder: (1) as a principal; (2) as a party under Section 7.02(a) of the Texas Penal
Code; (7) or (3) as a conspirator under the law of parties in Section 7.02(b) of the Texas Penal
Code. Because the trial court's charge authorized the jury to convict on alternative theories,
the verdict of guilt will be upheld if the evidence was sufficient on any one of the theories. (8) 

A. The evidence.

 The evidence at trial showed that Maria Rangel and Roxana Capulin were working
at El Mirador restaurant on Canal Street in Houston on the evening of May 31, 2002. Ms.
Capulin's husband testified that Roxana called him at about 10:00 p.m. to tell him that she
was closing the restaurant and would be coming home soon. The cook, Gabriel Mello,
testified that he left at about 10:15 p.m., and that Ms. Rangel and Ms. Capulin stayed behind
to close the restaurant. 

 Ruben Limon testified that he drove by the restaurant at around 11:15 p.m. and saw
two men and two women outside. One woman was putting a chain around the door, and the
other woman was standing nearby talking to one of the men. The second man, whom Limon
identified at trial as appellant, was talking on a pay phone. Limon further testified that he
observed a "red truck" parked outside the restaurant. 

 Roxana's husband became worried when she did not arrive home by 10:30 p.m., so
he called the restaurant. When no one answered the phone, he drove to the restaurant to look
for her. As soon as he arrived, he saw that Roxana's maroon Dodge Durango (9) was gone, the
restaurant lights were off, and the restaurant door was chained but unlocked. Maria Rangel's
husband later arrived, and they entered the restaurant and found no one inside. 

 Roxana's car was found on the morning of June 1, 2002. Emil Havelka testified that
he saw a Dodge Durango parked in the middle of Joyner Street, near his office, at 7:00 a.m. 
When he saw two bodies inside the car and a large pool of blood on the ground by the back
passenger door, he called the police. 

 The police arrived and found the bodies of Roxana Capulin and Maria Rangel inside
the car. The car doors were unlocked and the keys were in the ignition. The Durango had
three rows of seats; Ms. Rangel's body was in the middle row, and Ms. Capulin's body was
in the back row. Ms. Rangel was wearing an El Mirador apron, and she had duct tape on her
hands and wrists and over her eyes and mouth. Ms. Capulin also had duct tape over her eyes
and mouth. The medical examiner testified that Ms. Rangel's death was caused by two
gunshot wounds to her head, and that Ms. Capulin died from a single gunshot wound to her
head. 

 Police recovered a bullet and three cartridge casings from inside the car. The medical
examiner also recovered bullet fragments from Ms. Capulin's head during her autopsy. The
firearms expert who examined the ballistics evidence testified that all three bullets could
have been fired from the same 9-millimeter firearm. 

 Harris County Sheriff's Deputy Miguel Gonzalez testified that, over two months later,
on August 20, 2002, he was contacted by a confidential informant with information about the
murders. Deputy Gonzalez and Detective Alejandro Ortiz met with the informant and
appellant at a Marriott hotel room at about 7:30 p.m. that evening. (10) Deputy Gonzalez
testified that appellant said he had information regarding the women who were abducted
from El Mirador restaurant, and that he needed the $5,000 Crimestoppers reward money
because his wife was pregnant. Appellant stated that Edgardo Cubas and Eduardo Navarro,
a juvenile, had abducted and murdered the victims. (11) He said that Cubas and Navarro had
invited him to go along with them that night, but he declined their invitation and followed
them instead. He parked his car in a parking lot across the street from the restaurant and saw 
Cubas and Navarro abduct the women. He then followed them to a remote location and
parked nearby, but he left the scene after he heard gunshots.

 At this point, Det. Ortiz thought appellant was a witness to the double murder, so he
asked appellant and the informant if they would continue the interview at the Harris County
Sheriff's homicide division office. They agreed to do so, and appellant drove himself and
the informant to the office. When they arrived at around 9:45 p.m., Det. Ortiz and a
Detective Brown conducted a videotaped interview with appellant. Appellant again stated
that he witnessed the abduction from across the street. He said that Navarro stayed in Cubas's
Honda Accord while Cubas talked to the women outside the restaurant; then Cubas got into
a Dodge Durango with the women, and Navarro followed them as they drove away. 
Appellant followed both cars to a second location and parked about one hundred twenty feet
away. Cubas and the women remained parked in the Durango for about thirty minutes. One
of the women got out of the car and tried to run away, but Cubas caught her and put her back
inside the vehicle. Appellant saw that Cubas had a pistol and a large roll of tape in his hands,
and he watched as Cubas fired three shots into the Durango. Appellant then left, and Navarro
saw him as he was driving away. Appellant later saw Cubas and Navarro in a bar, and Cubas
threatened to kill him and his family if he told anyone what he had seen. 

 During the interview, Det. Ortiz asked appellant if he would agree to give a saliva
sample. After appellant consented to give a saliva sample, he added that he, Cubas, and
Navarro left the club and returned to the scene, where Cubas forced him to have sex with Ms.
Rangel's body. 

 Det. Ortiz testified that he took appellant into custody after he learned of an
outstanding warrant for appellant's arrest at approximately 1:10 a.m. Appellant then agreed
to show the detective where Cubas and Navarro lived. They left the homicide division office
at 2:05 a.m. and returned at 3:10 a.m. At 7:30 a.m., appellant was taken before a magistrate,
who gave him his statutory warnings.

 Appellant was then taken to the Houston Police Department homicide division office,
where he was interviewed by Officers Jesus Sosa and Heraclio Chavez. In this videotaped
statement, appellant told a very different version of the events. He said that Cubas picked
him up in his Honda Accord at about 8:30 p.m, and they then picked up fourteen-year-old
Navarro. Appellant and Cubas went to a few bars while Navarro waited in the car; then they
went looking for a bar that would admit Navarro. Cubas, who was in possession of a 9-millimeter Beretta pistol, said that he wanted to commit a robbery because he needed money
to pay rent. They were driving on Canal Street when they saw two women coming out of a
restaurant. Cubas parked in a nearby parking lot, got out of the car, and approached the
women from behind as they were walking toward the Durango. Cubas motioned for
appellant to come over to them, and Cubas made Roxana Capulin give appellant the keys. 
Ms. Capulin sat in the back seat with Cubas, Maria Rangel sat in the middle seat, and
appellant drove the vehicle. As appellant drove to an area near "Dixie and Wayside," Cubas
placed tape over the eyes and mouths of the women and bound Ms. Rangel's hands with tape. 
Cubas wanted to sexually assault Roxana Capulin, so he told Ms. Rangel "to get down from
the truck" when they stopped. Ms. Rangel fell out of the car onto the ground. Appellant also
got out of the car, and Cubas stayed inside with Roxana Capulin. When Ms. Rangel later got
too close to the car, Cubas pointed the gun at her and told her to take her clothes off. He told
appellant "to fuck her by force," and appellant "gave her like 3 thrusts" and ejaculated. 
Appellant then "fixed . . . her pants" and put her back inside the Durango, where Cubas was
forcing Ms. Capulin to perform oral sex on him. Appellant told Cubas to let the women go. 
He drove the car a short distance, then turned it off, left the key in the ignition, got out, and
started walking away. As he was walking to the Accord where Navarro was waiting, he
heard three shots coming from the direction of the Durango. Cubas then came running
toward him, and they got into the Accord with Navarro and left. When appellant asked
Cubas what happened to the women, he said, "I killed them whores." Cubas said he had
taken money and jewelry from the women, and he showed appellant a chain that belonged
to one of them. Cubas dropped appellant and Navarro off at the apartment complex where
they both lived at about 12:05 a.m. 

 Appellant's videotaped statements were not the only evidence of his participation in
the double murder. DNA evidence also tied appellant to the offense. Appellant's DNA
profile was consistent with the DNA profile of sperm found on Rangel's clothing and in her
vagina. Cubas's DNA profile was consistent with the DNA profile of sperm found on
Capulin's panty hose and in her mouth. 

 The State also presented evidence of appellant's involvement in the extraneous murder
of fifteen-year-old Esmeralda Alvarado on January 18, 2002, four months before the charged
murders. Ms. Alvarado's boyfriend, Osiel Blanco, testified that she came over to his house
to watch television that evening, and that she went outside to use a nearby pay phone at about
9:30 p.m. When Blanco went outside to look for her about ten minutes later, she was gone. 
Her body was found four days later. The medical examiner testified that she died from a
gunshot wound to the head. Appellant was included as a possible contributor of the DNA
obtained from sperm found in Ms. Alvarado's anus. Cubas's DNA was consistent with the
DNA profile of sperm found in Ms. Alvarado's vagina. 

 Appellant admitted his involvement in Esmeralda Alvarado's murder in a videotaped
interview with Detectives Chavez and Ortiz. Appellant stated that one night in January 2002,
he and Cubas were driving around in a truck belonging to Cubas's father. They passed by
a young girl talking on a pay phone, and Cubas said that he wanted to have sex with her, so
he turned the truck around and went back to where she was standing. Cubas forced her at
gunpoint to get into the back seat of the truck, and appellant got into the back seat with her. 
Cubas tied a rag over the girl's eyes and drove them to a deserted area. Appellant stayed in
the truck while Cubas took the girl outside and raped her. When they returned to the truck,
appellant made her get into the back seat with him, and he raped her. They initially planned
to leave her at the scene, but as they were leaving she yelled, "Hey, don't leave me here." 
They let her back into the truck, and she asked them to drop her off near her home. Cubas
started to drive away, but then decided to take her back to where they had raped her. They
got out of the truck and Cubas made her perform oral sex on him. Cubas then shot her in the
head, and he and appellant got into the truck and drove away.

B. Sufficiency of the evidence to establish Appellant's intent to commit capital murder.

 Applicant claims that he "specifically denied" any intent to kill Roxana Capulin and
Maria Rangel when he said in his statements that he urged Cubas to let them go and that he
was leaving when Cubas shot them. However, the jury was free to take all of the evidence
into account and to believe or disbelieve any portion of appellant's statements. Appellant,
by his own admission, knew that Cubas had a gun and that he planned to commit a robbery. 
At some point after they left the restaurant with the women, appellant knew that Cubas
planned to sexually assault Ms. Capulin. Appellant drove the vehicle from the restaurant and
sexually assaulted Ms. Rangel when they arrived at their destination. Four months prior to
the instant offense, appellant participated in the kidnapping and sexual assault of Esmeralda
Alvarado, who was ultimately shot and killed by Cubas in front of appellant. The jury could
have inferred from the evidence that appellant likewise intended to promote or assist in the
murders of Ms. Capulin and Ms. Rangel. After viewing the evidence in the light most
favorable to the prosecution, we conclude that a rational jury could have found that the
essential elements of the offense were proven beyond a reasonable doubt. (12) Point of error
two is overruled.

Jury Instructions 


 In his first point of error, appellant asserts that the trial court erroneously refused to
instruct the jury on the lesser-included offense of aggravated kidnapping. Appellant again
relies on his own statements to support his claim. He argues that a jury could rationally find
him guilty only of the lesser-included offense, because in his statements he admitted only
kidnapping and sexual assault. 

 We use a two-pronged test to determine whether a defendant is entitled to an
instruction on a lesser-included offense. (13) The first step in our analysis is to determine if the
lesser offense is included within the proof necessary to establish the offense charged. (14) The
second step requires an evaluation of the evidence to determine whether there is some
evidence that would permit a jury rationally to find that the defendant is guilty only of the
lesser offense. (15) In other words, there must be some evidence from which a jury could
rationally acquit the defendant of the greater offense while convicting him of the
lesser-included offense. (16) The evidence must establish the lesser-included offense as a valid,
rational alternative to the charged offense. (17) 

 Appellant was charged with murdering more than one person during the same criminal
transaction. (18) The offense of aggravated kidnapping is not included within the proof
necessary to establish the offense of capital murder as charged in this case. (19) Therefore,
point of error one is overruled.

 In his third point of error, appellant argues that the trial court erred by instructing the
jury on the parties theory of liability because the law of parties was not pled in the
indictment. He alleges that the State's failure to indict him as a party to the offense violated
the Sixth Amendment and his constitutional right to due process under In re Winship, (20)
Apprendi v. New Jersey, (21) and their progeny. 

 At trial, appellant objected only to the "application of the 'attempts to aid' portion of
Section 7.02(a) of the Texas Penal Code," arguing that it was unconstitutional for a person
who "acted but failed to assist another" to be liable for the other person's completed offense. 
Appellant's trial objection does not comport with the issue he raises on appeal; thus, he has
failed to preserve his complaint for our review. (22) In any event, "[i]t is well-settled that the
law of parties need not be pled in the indictment." (23) Point of error three is overruled.

Vienna Convention Issues


 In points of error four, five, and six appellant argues that his consular notification
rights under the Vienna Convention were violated. In point of error four, he argues that his
videotaped statements to the police should have been suppressed because of a Vienna
Convention violation. In point of error five, he complains that the trial court erred in failing
to charge the jury under article 38.23 (24) concerning his rights under the Vienna Convention. 
And, in point of error six, he requests a new punishment trial as a remedy for a Vienna
Convention violation.

 Appellant's argument on all three points of error is that, because he is a Salvadoran
citizen, the police were required to notify him without delay that he had a right to seek
assistance from the Salvadoran consulate and that the police were required to inform the 
Salvadoran consulate without delay of his detention so that it could provide consular
assistance. He complains that the police failed to provide such notice "without delay." 

 The State argues that: (1) appellant lacks standing to enforce the provisions of the
Vienna Convention in a state criminal proceeding; (2) the record does not affirmatively show
that he was not notified of his right to consult his consulate; (3) his consulate was, in fact,
timely notified of his detention; and (4) there was no causal connection between the
purported treaty violation and the acquisition of his custodial videotaped statements.

A. The Vienna Convention

 The Vienna Convention on Consular Relations (25) is a treaty which protects the rights
of United States citizens abroad and foreign nationals in the United States. (26) The treaty
promotes the effective delivery of consular services in foreign countries, including access to
consular assistance when a citizen of one country is arrested, committed to prison or custody
pending trial, or detained in any other manner in another country. In its preamble, the treaty
states that "the purpose of such privileges and immunities is not to benefit individuals but to
ensure the efficient performance of functions by consular posts on behalf of their respective
States[.]" (27) 

 To ensure that no signatory nation denies consular access and assistance to another
country's citizens traveling or residing in a foreign country, Article 36 of the Vienna
Convention provides the following:


 With a view to facilitating the exercise of consular functions relating to
nationals of the sending State:


 

 (a) consular officials shall be free to communicate with nationals of the
sending State and to have access to them. Nationals of the sending State shall
have the same freedom with respect to communication with and access to
consular officials of the sending State;


 (b) if he so requests, the competent authorities of the receiving State shall,
without delay, inform the consular post of the sending State if, within its
consular district, a national of the State is arrested or committed to prison or
to custody pending trial or is detained in any other manner. Any
communication addressed to the consular post by the person arrested, in
prison, custody or detention shall also be forwarded by the said authorities
without delay. The said authorities shall inform the person concerned without
delay of his rights under this sub-paragraph;


 (c) consular officials shall have the right to visit a national of the sending State
who is in prison, custody or detention, to converse and correspond with him,
and to arrange for his legal representation. They shall also have the right to
visit any national of the sending State who is in prison, custody or detention
in their district in pursuance of a judgment. Nevertheless, consular officers
shall refrain from taking action on behalf of a national who is in prison,
custody or detention if he expressly opposes such action.


 2. The rights referred to in paragraph 1 of this Article shall be exercised in
conformity with the laws and regulations of the receiving State, subject to the
proviso, however, that the said laws and regulations must enable full effect to
be given to the purposes for which the rights accorded under this Article are
intended. (28)


The provisions of Article 36 have also been implemented in various federal regulations
which apply to federal authorities in federal proceedings. (29) However, neither treaties nor 
federal regulations necessarily confer judicially enforceable rights on private persons in a
state criminal or civil proceeding.

 Under normal circumstances, "[i]nternational agreements, even those directly
benefitting private persons, generally do not create private rights or provide for a private
cause of action in domestic courts[.]" (30) Because treaty violations have traditionally been
resolved by "international negotiations and reclamations," the Supreme Court has stated that
"[i]t is obvious that with all this the judicial courts have nothing to do and can give no
redress." (31) Sometimes, however, a treaty may explicitly confer judicially enforceable rights
to persons of one nation residing in another, such as treaties dealing with property rights
asserted by a citizen in one nation claiming property by descent or inheritance in another
country. (32) These latter, "privately enforceable," treaty provisions are in the same category
as congressional statutes under the Supremacy Clause. (33) 

 During the past decade innumerable state and federal courts have been asked to decide
whether Article 36 of the Vienna Convention confers individual rights which may be
judicially enforced in criminal or civil proceedings. (34) There is no general consensus on this
question. This Court has previously held that the Vienna Convention does not create the type
of personal rights the violation of which can be remedied in Texas criminal courts by the
suppression of evidence under article 38.23. (35) The United States Court of Appeals for the
Fifth Circuit has recently reiterated the position of many American jurisdictions in
concluding that "the Vienna Convention does not confer individually enforceable rights." (36) 
Appellant argues that our prior holding should be reconsidered in light of the more recent
International Court of Justice (ICJ) decisions in Federal Republic of Germany v. United
States (LaGrand), (37) and Mexico v. United States (Avena). (38) In these two cases, the ICJ
interpreted Article 36 of the Vienna Convention as giving detained foreign nationals
individual rights that the foreign national's home country could invoke in a proceeding
before the ICJ. (39)

 The issues of whether American state and federal courts are bound by the ICJ
decisions in LaGrand and Avena or whether Article 36 confers personal rights under the
federal constitution may be definitively resolved only by the United States Supreme Court. (40) 
In Breard v. Greene, (41) the Supreme Court noted in dicta that Article 36 "arguably confers on
an individual the right to consular assistance following arrest[,]" (42) but that Court has not
spoken on these issues since the ICJ decisions were issued. In any event, we need not resolve
those issues in this case because, even assuming that American state and federal courts are
bound by LaGrand and Avena or that Article 36 does confer personal rights, appellant has
not shown: (1) that any of the rights he claims under the Vienna Convention were violated;
or (2) that any purported treaty violation either caused him to do anything he would not
otherwise have done or affected the fairness of his trial in any way.

B. Pertinent facts

 As noted above, appellant and a confidential informant voluntarily contacted the
police on August 20th, stating that they wished to offer information about the murders of
Roxana Capulin and Maria Rangel. According to Detective Ortiz, they did so because they
were interested in the reward money. Det. Ortiz and Deputy Gonzalez met with the two men
in a Marriott Hotel room that evening thinking that appellant simply had information about
the double murder. When Det. Ortiz asked him to come to the homicide division office to
continue the interview, now as a witness, appellant freely and voluntarily did so. He drove
his own car and was accompanied only by the confidential informant. He freely and
voluntarily continued to speak to the officers, all of whom spoke fluent Spanish with him,
throughout the evening hours of August 20th. 

 Appellant, who eventually told the officers that he was born in El Salvador, (43) testified
that he came to America when he was eighteen, had lived in the United States for seven
years, and had worked in a chemical plant. He said that he did not read or write much
English or Spanish and that he had been convicted of carrying a weapon in 1999. He told
the officers when they first got to the police station that he was on probation for aggravated
robbery. The present record contains the statutory warnings appellant received when
charged with that aggravated robbery. They show that he had been informed of his right, in
both English and Spanish, to notify the Salvadoran consulate and seek its assistance but that
he explicitly waived his right to do so.

 After Det. Ortiz asked appellant for an oral swab at 10:48 p.m. on August 20th, 
appellant began to speak of himself as being less a mere witness to a double murder and more
a reluctant party to that crime. Only then did Det. Ortiz begin to be suspicious, and he gave
appellant Miranda warnings in Spanish. At about 1:00 a.m. on August 21st, Det. Ortiz
discovered that appellant had an outstanding arrest warrant on a motion to adjudicate
stemming from his aggravated robbery probation. It was then that Det. Ortiz considered
appellant in custody on that open arrest warrant. 

 At 7:30 a.m. on August 21st, appellant was taken to a magistrate and given his
statutory warnings in Spanish through an interpreter. He told the magistrate that he
understood those warnings. Later that morning he was again given Miranda warnings and
was told that he was under suspicion concerning three murders-the murders of Roxana
Capulin and Maria Rangel, and the earlier murder of Esmeralda Alvarado. 

 According to every officer who testified, appellant was repeatedly given Miranda
warnings in Spanish, and he repeatedly stated that he understood all of his legal rights and
voluntarily agreed to waive them. At no point did he request to end the interviews, invoke
his right to silence, request the assistance of an attorney, or request to speak to anyone else. (44) 
At no point did he request that he be allowed to contact the Salvadoran consulate or request
that the officers contact the consulate. Appellant finished his fifth videotaped statement late
on the evening of August 21st.

 The next day, August 22nd, he was charged with the capital murders of Ms. Capulin
and Ms. Rangel, and, at 5:59 p.m. that afternoon, Officer Rodriguez notified the Salvadoran
consulate by fax that appellant had been detained on capital murder charges. This
notification, as well as a news release on the double murder, was sent approximately forty
hours after Det. Ortiz considered appellant detained in custody on the unrelated probation
revocation arrest warrant.

 There is nothing in the trial record indicating that the Salvadoran consulate took any
action as a result of this notification. Midtrial, the defense sought a continuance to obtain
testimony from a Salvadoran consular official concerning consular affairs, but, according to
defense counsel, this attempt was unsuccessful:

 We had gone through the El Salvadorian consulate and embassy both by letter,
fax, and phone call, by myself, my co-counsel, and our investigator to attempt
to enlist one of their consular officers to come down and testify. 
Unfortunately, diplomatic personnel are immune from process in Texas; and,
of course, there is no U.S. [sic?] consulate officer here in Houston.


 Thus, the record indicates that when appellant's attorneys and investigator sought
assistance from the Salvadoran consulate, they were rebuffed. There is no evidence in the
record as to what assistance the Salvadoran consulate might have provided had the police
notified the consulate sooner than they did.

C. The consulate was notified of appellant's detention "without delay."

 Article 36 of the Vienna Convention requires that "the competent authorities of the
receiving State shall, without delay, inform the consular post of the sending State" when a
citizen of that sending State is arrested or otherwise detained if the citizen so requests. The
authorities "shall inform the person concerned without delay of his rights" under Article 36. 
In the present case, there is no evidence that the police informed appellant of this right to
request consular notification, but there is undisputed evidence that the police notified the
Salvadoran consulate of appellant's arrest and detention nevertheless. Appellant cannot
complain that the police erred by failing to tell him that he could request them to notify the
consulate of his detention if they notified the consulate even without his request. Appellant
claims that he wanted the consulate notified. The consulate was notified. There is no basis
for complaint here.

 The only issue, then, is whether the police notified the Salvadoran consulate "without
delay." Article 36 does not define the phrase "without delay," (45) nor does appellant refer us
to any specific treaty document, historical analysis, or legal precedent which defines that
term's meaning. So what does "without delay" mean in the context of Article 36?

 Although arguably we are not bound by the decisions of the ICJ unless and until the
United States Supreme Court decrees that Texas courts must follow ICJ decisions as the
supreme law of this land, (46) we are not forbidden from consulting those decisions. (47) In
Avena, the Mexican Government argued that the term "without delay" should be interpreted
to mean "unqualified immediacy" and "prior to any interrogation of the foreign detainee." 
The ICJ rejected Mexico's position, noting that, under this view, 

 it would follow that in any case in which a foreign national was interrogated
before being informed of his rights under Article 36, there would ipso facto be
a breach of that Article, however rapidly after the interrogation the information
was given to the foreign national. (48)


Indeed, we are unable to find any language within the Vienna Convention that demonstrates
that the signatories agreed that each nation's authorities were required to advise a foreign
national of his right to contact his consulate before any police questioning could begin or
proceed. In fact, we are not aware of any laws or judicial precedents in any of the signatory
nations that include such a requirement. Nor is there a treaty or other legal requirement that
the police must stop their interrogation even if a foreign national requests consular
assistance. (49)

 The Avena Court, in addressing the meaning of the term "without delay," noted that
the purpose of the Convention was "for consular officials to be free to communicate with
nationals of the sending State, to have access to them, to visit and speak with them and to
arrange for their legal representation." (50) According to the ICJ,

 It is not envisaged, either in Article 36, paragraph 1, or elsewhere in the
Convention, that consular functions entail a consular officer himself or herself
acting as the legal representative or more directly engaging in the criminal
justice process . . . . Thus, neither the terms of the Convention as normally
understood, nor its object and purpose, suggest that "without delay" is to be
understood as "immediately upon arrest and before interrogation." (51)


The Avena Court noted that, during the diplomatic conference discussions leading up to the
final treaty draft, the Commission had used the phrase "without undue delay." (52) No delegate
proposed using the word "immediately." (53) Germany proposed adding the phrase "but at
latest within one month." (54) The United Kingdom proposed substituting the term "promptly"
or "no later than 48 hours" after detention. (55) According to the ICJ, the delegates could not
agree on any specific time period, but they did agree on dropping the word "undue." (56) Thus,
the final treaty draft intentionally contains the phrase "without delay," presumably to permit
flexibility. The ICJ also stated that, during these Conference debates, no delegate "made any
connection [of the phrase "without delay"] with the issue of interrogation." (57) Therefore, the
Avena court concluded that the Article 36 notification rights "cannot be interpreted to signify
that the provision of such information must necessarily precede any interrogation, so that the
commencement of interrogation before the information is given would be a breach of Article
36." (58) 

 We turn to sources closer to home: How does the United States Department of State
interpret the phrase "without delay" in Article 36, both as that article applies to Americans
detained in a foreign country and foreigners detained in the United States? The Consular
Notification and Access booklet states that a foreign national should be notified "without
delay" of his right to consular assistance. (59) 

 There should be no deliberate delay, and notification should occur as soon as
reasonably possible under the circumstances. Once foreign nationality is
known, advising the national of the right to consular notification should follow
promptly. (60)


Notification to the consulate should also occur "without delay" once the foreign national has
requested that it be made. 

 The Department of State would normally expect notification to consular
officials to have been made within 24 hours, and certainly within 72 hours. On
the other hand, the Department does not normally consider notification of
arrests and detentions to be required outside of a consulate's regular working
hours. In some cases, however, it will be possible and convenient to leave a
message on an answering machine at the consulate or to send a fax even
though the consulate is closed. (61)


The booklet goes on to state its guiding principle that American authorities "should permit
a consular officer the same access to a foreign national that you would want an American
consular officer to have to an American citizen in a similar situation in a foreign country." (62) 
The State Department tells its overseas consular officials to lodge a diplomatic protest if
detaining authorities in a foreign country do not notify the consulate within 72 hours of an
American citizen's arrest. (63) At least two other American courts have stated that consular
notification made within one to three days of arrest or detention is made "without delay." (64) Turning to Texas, our state criminal procedure laws have used the phrase "without
delay" or "without unnecessary delay" in many instances, (65) including when an arrestee is
entitled to be taken before a magistrate. Article 15.17 of the Code of Criminal Procedure
states that "the person making the arrest or the person having custody of the person arrested
shall without unnecessary delay, but not later than 48 hours after the person is arrested, take
the person arrested or have him taken before some magistrate of the county where the
accused was arrested. . . ." (66) The purpose of this provision is to comply with constitutional
and statutory requirements that an accused person be promptly and fully informed of the
accusation against him, as well as his legal rights, including his Miranda rights and his right
to reasonable bail. (67) This requirement is similar to the Fourth Amendment requirement that
a person arrested without warrant be given a "prompt" judicial determination of probable
cause to permit further detention. In County of Riverside v. McLaughlin, (68) the Supreme
Court held that a jurisdiction that provides for such probable cause hearings within 48 hours
is sufficient to survive "systemic challenges" to its system. (69)

 After canvassing (1) the words of the Vienna Convention itself; (2) the interpretation
of the phrase "without delay" by the ICJ in the Avena case; (3) the meaning that the State
Department has ascribed to that term both in application to Americans who are detained
abroad and foreigners detained in the United States; (4) other American courts that have
considered this wording; and (5) use of the phrase "without delay" in Texas law, we conclude
that Officer Rodriguez, in faxing the required notification within 48 hours of appellant's
arrest on the probation revocation warrant, notified the Salvadoran consulate "without delay." 
We hold that Texas authorities complied with their obligations under Article 36 of the
Vienna Convention.

 Therefore, the trial court did not err in refusing to suppress appellant's videotaped
statements, in declining to give any article 38.23 jury instruction concerning the Vienna
Convention, or in refusing to reform appellant's death sentence to a sentence of life
imprisonment.

 D. No causal connection or prejudice shown.

 Finally, even assuming that the Vienna Convention was violated, and even assuming
that such violations may be remedied in an American criminal proceeding, (71) appellant has
not shown any causal connection between the purported failure to inform him of his right to
consult his consul or with any purported "tardy" notification of the El Salvadoran consulate
and either the acquisition of his statements or the fairness of his trial. (72) 

 The only testimony that could arguably support appellant's position that if he had a
chance to speak with someone who would have explained his rights, he would not have
continued speaking with the police, is his testimony during the hearing on the motion to
suppress. There, he stated that he did not really understand the American legal system or the
consequences of waiving his legal rights because he did not have these same rights in El
Salvador. However, the evidence also shows that it was appellant who approached the police
with his story about being the eyewitness to a double murder; he initiated the contact with
the legal system. Further, appellant was not a novice in the American legal system. He had
two prior criminal cases; during one of those prior proceedings, he explicitly acknowledged
that he knew he had a right to consular assistance, and he explicitly waived that right in
writing. Throughout August 20th and 21st he was repeatedly given his Miranda warnings by
both Spanish-speaking police officers and by a neutral magistrate through a Spanish-speaking
interpreter. On each and every occasion he explicitly said that he understood his legal rights
and wished to waive them. 

 Showing a causal connection or prejudice under these circumstances is nigh
impossible. As one federal court stated,

 Prejudice has never been-nor could reasonably be-found in a case where a
foreign national was given, understood, and waived his or her Miranda rights. 
Courts have uniformly found that no prejudice can exist in that situation,
because the advice a consular official would give would simply augment the
content of Miranda, which the foreign national has already waived. (73)


 Finally, there is no evidence in the record that the Salvadoran consulate regularly
provides any assistance at all to its foreign nationals detained in Houston. (74) Indeed, the
evidence indicates the opposite. The defense team was unable to either persuade or subpoena
a Salvadoran consular official to appear at trial, and it indicated that there is no consular
official based in Houston. In the present case, no showing of prejudice whatsoever has been
made. Appellant's assertions of prejudice are entirely speculative and belied by the record
evidence and applicable precedent. (75) Therefore, because appellant has failed to show that
he was in any way prejudiced by the alleged Vienna Convention violation, we reject his
claims. Appellant's fourth, fifth, and sixth points of error are overruled.

Article 38.23 Instruction on Voluntariness of Statements


 In point of error seven, appellant claims that the trial court erroneously refused his
request for an Article 38.23 jury instruction on the voluntariness of his statements. When the
evidence presented at trial raises a factual issue as to whether a defendant had been warned
of his rights and voluntarily waived them prior to making a statement, he is entitled to an
instruction on the voluntariness of the confession. (76) Appellant argues that he raised a fact
issue as to whether his statements were legally obtained by presenting evidence that he
lacked education, he had "trouble with the language," and "[h]e was not a native of this
country and had no reason to understand the many rights he was spoken to about." (77) 

 As noted above, the evidence at trial showed that appellant approached police with
information about the case and that he agreed to go from the hotel to the Harris County
Sheriff's homicide division office to provide more details about what he had allegedly
witnessed. He was taken before a magistrate for his warnings shortly after he was arrested
by Det. Ortiz. (78) The magistrate read the warnings to appellant in English, an interpreter
translated the warnings into Spanish, and appellant indicated that he understood the
warnings. Appellant was then transported to the Houston Police Department homicide
division office, where he gave a statement to Officers Sosa and Chavez regarding his
participation in the murders of Maria Rangel and Roxana Capulin. Prior to taking his
statement, these officers again read appellant his rights in compliance with Miranda and
Article 38.22. They read his rights in Spanish and appellant indicated that he understood his
rights. (79) Appellant later gave a statement to Officer Chavez and Det. Ortiz admitting his
involvement in Ms. Alvarado's murder. Before asking appellant to make his statement,
Officer Chavez again read appellant his rights in Spanish, and appellant again indicated that
he understood his rights. Officer Chavez testified that appellant did not seem to have any
difficulty understanding him. The officers further testified that they conducted the interviews
in Spanish, they neither threatened appellant nor promised him anything, and they never
denied him food, drink, or the opportunity to use the bathroom. 

 Appellant failed to establish at trial that his education, language, or nationality
affected the voluntariness of his statements. Thus, the trial court did not err in refusing his
request for an Article 38.23 instruction. Point of error seven is overruled. 

The Punishment Charge


 In points of error eight, nine, and ten, appellant challenges the trial court's charge to
the jury on punishment, citing Apprendi v. New Jersey, (80) and Ring v. Arizona, (81) in support
of his argument. In point of error eight, he complains that the punishment charge on future
dangerousness failed to define the term "probability." In point of error nine, appellant claims
that the trial court should have instructed the jury that the State bore the burden of proof
beyond a reasonable doubt on the mitigation issue. We have previously addressed and
rejected these issues. (82) In point of error ten, appellant asserts that the anti-parties special
issue violated the requirements of Ring because it permitted him to receive the death penalty
if the jury found that he merely "anticipated that a human life would be taken." This claim
is also without merit, given our previous holding that Apprendi and Ring have no
applicability to Article 37.071 in its current form. (83) Points of error eight, nine, and ten are
overruled. 

 Evidentiary Hearing on Motion For New Trial
 

 In point of error eleven, appellant argues that the trial court erroneously denied him
an evidentiary hearing on his motion for new trial, in which he argued that the method and
chemicals used to administer the death penalty in Texas amounted to cruel and unusual
punishment in violation of the Eighth and Fourteenth Amendments of the United States
Constitution. (84) "When an accused presents a motion for new trial raising matters not
determinable from the record, which could entitle him to relief, the trial judge abuses his
discretion in failing to hold a hearing." (85) 

 The effect of granting a motion for new trial is to restore the case to its position before
the former trial. (86) A trial court cannot grant a new trial as to punishment only. (87) Even if
appellant's underlying claim of cruel and unusual punishment had been meritorious, that
claim deals only with the punishment stage. Therefore, a new trial on guilt or innocence
would not have been the appropriate vehicle by which to provide him relief. Thus, the trial
court did not abuse its discretion in failing to hold a hearing on the motion for new trial in
the instant case. Point of error eleven is overruled. 

United Nations Convention Against Torture 


 In points of error twelve, thirteen, and fourteen, appellant argues that his death
sentence violates the United Nations Convention Against Torture, Articles 6 and 14 of the
International Covenant on Civil and Political Rights, and the Supremacy Clause of the United
States Constitution. Although these treaties prohibit "torture or cruel, inhuman, or degrading
punishment," the Senate filed reservations to both treaties stating that this language did not
prohibit the United States from imposing capital punishment consistent with the
Constitution. (88) Points of error twelve, thirteen, and fourteen are overruled. 


Admission of Extraneous Offense Evidence 


 In point of error fifteen, appellant challenges the trial court's admission of the
extraneous murder of Esmeralda Alvarado at the guilt phase of the trial. Appellant argues
that this evidence was an inadmissible extraneous offense under Rule 404(b), and that it was
substantially more prejudicial than probative under Rule 403. 

 Evidence of other crimes, wrongs or acts is not admissible "to prove the character of
a person in order to show action in conformity therewith," but it may be admissible for other
purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity,
or absence of mistake or accident. (89) The admissibility of evidence is within the discretion
of the trial court and will not be overturned absent an abuse of discretion. (90) Appellant's
intent was a hotly contested issue at trial. Although he admitted his participation in the
kidnapping of Roxana Capulin and Maria Rangel and the sexual assault of Maria, he denied
any intent to kill them. In his statement to police, he said that he attempted to persuade
Cubas not to kill them and that he walked away from the Durango thinking that Cubas would
leave them there alive. Evidence of appellant's participation in Esmeralda Alvarado's
murder just four months earlier, however, served to rebut his argument that he lacked the
requisite intent to promote or assist Cubas in the capital murder in the instant case. Appellant
saw Cubas shoot Ms. Alvarado after they had kidnapped and sexually assaulted her. This
evidence demonstrated that appellant knew Cubas would also be likely to kill Ms. Capulin
and Ms. Rangel, and that he intended to promote or assist Cubas in their murders. The trial
court did not abuse its discretion in admitting this evidence for the purpose of proving
appellant's intent or knowledge. 

 Although the evidence is admissible under Rule 404(b), it may still be excluded under
Rule 403 if the trial court determines that its probative value is substantially outweighed by
the danger of unfair prejudice. (91) Appellant's intent was an essential disputed issue in the
case. Evidence of appellant's involvement in Ms. Alvarado's murder was relevant to the
jury's determination of whether appellant anticipated or intended the murders of Ms. Capulin
and Ms. Rangel. 

 Further, evidence of the Alvarado murder was not so prejudicial that the jury would
have been unable to limit its consideration of the evidence to its proper purpose. (92) In both
instances, it was, according to appellant, Cubas who did the actual killing in exactly the same
manner. There is nothing about Ms. Alvarado's murder that is more grisly or gruesome than
the double murders at issue here. And certainly the testimony concerning Ms. Alvarado's
rape and shooting was much shorter and less detailed than the testimony concerning the
charged offense. The extraneous evidence focused upon the single evidentiary fact that the
charged murders were an almost perfect "copycat" of the earlier one. The jury was entitled
to use this "copycat" evidence in deciding whether appellant knew that Cubas intended to kill
the two women, that appellant intended that Cubas kill the two women or anticipated that he
would do so, and that appellant assisted him in that endeavor. The probative value of the
evidence was not substantially outweighed by the danger of unfair prejudice, and the trial
court did not abuse its discretion in admitting it over appellant's Rule 403 objection. Point
of error fifteen is overruled. 

Punishment Charge


 Finally, in point of error sixteen, appellant argues that "[i]t was error for the trial court
to refuse to grant a charge at sentencing on the effect of a single juror's 'No' vote to the
future dangerousness question." He contends that, as a result, he was denied due process and
deprived of his right to have "a fully informed jury and individualized sentencing."

 We have repeatedly upheld the constitutionality of Article 37.071, Section 2(a)(1),
which prohibits informing jurors of the effects of their failure to agree on the special issues. (93) 
Appellant attempts to distinguish our precedent by arguing that there is no "statutory
prohibition" against informing the jury of the effect of a "no" vote on the future
dangerousness question, because the prohibition in Article 37.071, Section 2(a)(1) is limited
to "issues submitted under Subsection (c) or (e)." However, Subsections (c) and (e) both
expressly refer to Subsection (b), which includes the future dangerousness special issue. 

 Appellant was not entitled to have the jurors informed of the effect of their failure to
agree on the future dangerousness special issue. The trial court did not abuse its discretion
in refusing appellant's requested instruction. Point of error sixteen is overruled. 

 We affirm the judgment of the trial court.


Cochran, J.

Delivered: 

Publish 
1. Tex. Penal Code § 19.03(a).
2. Tex. Code Crim. Proc. art. 37.071, §§ 2(b) & (e). Unless otherwise indicated, all
references to Articles refer to the Texas Code of Criminal Procedure.
3. Id. § 2(g).
4. Id. § 2(h).
5. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
6. Tex. Penal Code § 19.03(a)(7)(A).
7. The charge authorized the jury to convict appellant as a party if it found beyond a
reasonable doubt that "with the intent to promote or assist the commission of the [capital murder]
offense, if any, [he] solicited, encouraged, directed, aided or attempted to aid Edgardo Cubas to
commit the [capital murder] offense . . . ."
8. Rabbani v. State, 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992). 
9. The Durango was a large SUV, but the witnesses called it either a "car" or a "truck."
10. Deputy Gonzalez was working a second job as a security officer for the Marriott Hotel.
11. Appellant referred to Navarro by his nickname, "Lalo."
12. Jackson, 443 U.S. at 319.
13. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).
14. Id.
15. Id. at 672; Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). 
16. Moore, 969 S.W.2d at 8.
17. Wesbrook v. State, 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000).
18. Tex. Penal Code § 19.03(a)(7)(A).
19. See Jacob v. State, 892 S.W.2d 905, 907 (Tex. Crim. App. 1995) (stating that the
determination of whether an offense is a lesser included offense must be done on a case-by-case
basis).
20. 397 U.S. 358 (1970).
21. 530 U.S. 466 (2000).
22. Tex. R. App. P. 33.1.
23. Marable v. State, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) (post-Apprendi
decision); Malik v. State, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997) (pre-Apprendi decision);
see also United States v. Osborne, 286 F. Supp. 2d 891, 902-03 (E.D. Tenn. 2003) (rejecting
defendant's claim that Apprendi requires prosecution to allege law of parties in indictment; "The
Court is unaware of any authority supporting the argument that Apprendi required the
government to allege aiding and abetting" in indictment).
24. Tex. Code Crim. Proc. art. 38.23. Appellant does not point to any evidence in the
trial record that raises a factual dispute concerning consular notification. His complaint appears
to be one of law: "Was the Vienna Convention violated, and, if so, what is the appropriate
remedy?"
25. Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 595
U.N.T.S. 261 (ratified by the United States on Nov. 24, 1969). 
26. See Vienna Convention, Preamble (noting that the signatories recognize that
"consular relations have been established between peoples since ancient times" and serve "the
maintenance of international peace and security, and the promotion of friendly relations among
nations").
27. Id.
28. Id., Article 36.
29. See, e.g., 28 C.F.R. § 50.5(a)(1) ("In every case in which a foreign national is arrested
the arresting officer shall inform the foreign national that his consul will be advised of his arrest
unless he does not wish such notification to be given"); 28 C.F.R. § 50.5(a)(2) (requiring the
arresting agent to inform the U.S. Attorney of the arrest and of the arrestee's wishes regarding
consular notification); 28 C.F.R. § 50.5(a)(3) (directing the U.S. Attorney to notify the
appropriate consul in accordance with the arrestee's wishes); 8 C.F.R. § 236.1(e) (requiring the
INS to notify detained aliens of the right to communicate with consul).
30. Restatement (Third) of the Foreign Relations Law of the United States §
907 cmt. a, at 395 (1987); see Hamden v. Rumsfeld, ___ F.3d __, ___, 2005 U.S. App. LEXIS
14315, *13-20 (D.C. Cir., July 15, 2005) (quoting Restatement comment and holding that federal
courts cannot enforce the provisions of the Geneva Convention Relative to the Treatment of
Prisoners of War in an individual habeas corpus proceeding).
31. The Head Money Cases, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact
between independent nations. It depends for the enforcement of its provisions on the interest and
the honor of the governments which are parties to it. If these fail, its infraction becomes the
subject of international negotiations and reclamations, so far as the injured party chooses to seek
redress, which may in the end be enforced by actual war"); see also Argentine Republic v.
Amerada Hess Shipping Corp., 488 U.S. 428, 442 (1989) (holding that the Geneva Convention
on the High Seas and the Pan American Maritime Neutrality Convention "only set forth
substantive rules of conduct and state that compensation shall be paid for certain wrongs. They
do not create private rights of action") (footnote omitted); United States v. Jimenez-Nava, 243
F.3d 192, 195 (5th Cir. 2001) (noting that treaties "do not generally create rights that are
enforceable in the courts"); United States v. Li, 206 F.3d 56, 67 (1st Cir. 2000) (Selya & Boudin,
JJ., concurring) ("The background presumption that treaties do not create privately enforceable
rights . . . [is an] extremely important principle. . . . It is surpassingly difficult to accept the idea
that, in most instances, either the Executive Branch or the ratifying Senate imagined that it was
empowering federal courts to involve themselves in enforcement on behalf of private parties who
might be advantaged or disadvantaged by particular readings of particular treaty provisions");
United States v. Gengler, 510 F.2d 62, 67 (2d Cir. 1975) (stating that "even where a treaty
provides certain benefits for nationals of a particular state-such as fishing rights-it is
traditionally held that any rights arising out of such provisions are, under international law, those
of the states and . . . individual rights are only derivative through states") (internal quotations
omitted); United States v. Rosenthal, 793 F.2d 1214, 1232 (11th Cir. 1986) (even if United States
violated its extradition treaty with Colombia, defendant could not seek relief from that act
because "[u]nder international law it is the contracting foreign government that has the right to
complain about a violation").
32. See The Head Money Cases, 112 U.S. at 598.
33. Id.
34. Refer to the cases and articles cited in note 36 infra.
35. Rocha v. State, 16 S.W.3d 1, 13-19 (Tex. Crim. App. 2000); Hinojosa v. State, 4
S.W.3d 240, 252 (Tex. Crim. App. 1999) (rejecting defendant's claim that his death sentence
violated the United Nations Charter and stating, "Generally, individuals do not have standing to
bring suit on an international treaty when sovereign nations are not involved in the dispute").
36. Cardenas v. Dretke, 405 F.3d 244, 253 (5th Cir. 2005); see also Medellin v. Dretke, 371
F.3d 270, 279 (5th Cir. 2004), cert. dism'd, 545 U.S. ___ , 125 S.Ct. 2088 (2005) ("the Vienna
Convention, as interpreted by this Court in the past, does not confer an individually enforceable
right"); United States v. Jimenez-Nava, 243 F.3d at 198 (defendant's argument "fails to lead to an
ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation
between a detained foreign national and his consular office. Thus, the presumption against such
rights ought to be conclusive").

 Some American courts have found that the Vienna Convention's preamble indicates the
drafters' intent not to provide an individual right. As the preamble explicitly states, the Vienna
Convention does not intend to benefit individuals. See United States v. Lombera-Camorlinga,
206 F.3d 882, 885 (9th Cir. 2000); United States v. Li, 206 F.3d at 62; United States v. Carrillo,
70 F. Supp. 2d 854, 859 (N.D. Ill. 1999); United States v. Hongla-Yamche, 55 F. Supp. 2d 74, 77
(D. Mass 1999). 

 American courts that have addressed the issue of consular notification are split on
whether Article 36 creates an individual right. Compare Breard v. Greene, 523 U.S. 371, 376
(1998) (Vienna Convention "arguably confers" an individual right); United States v. Briscoe, 41
V.I. 446, 69 F. Supp. 2d 738, 746-47 (D. V.I. 1999) (Article 36 confers an individual right upon
foreign nationals); United States v. Hongla-Yamche, 55 F. Supp. 2d at 78 (same); United States
v. Alvarado-Torres, 45 F. Supp. 2d 986, 989 (S.D. Cal. 1999) (same), with United States v.
Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001) (concluding that "the Vienna Convention does
not create a right for a detained foreign national to consult with the diplomatic representatives of
his nation that the federal courts can enforce"); United States v. Bustos de la Pava, 268 F.3d 157,
165 (2d Cir. 2001) ("Even if we assume arguendo that De La Pava had judicially enforceable
rights under the Vienna Convention-a position we do not adopt-the Government's failure to
comply with the consular-notification provision is not grounds for dismissal of the indictment");
United States v. Tapia-Mendoza, 41 F. Supp. 2d 1250, 1253 (D. Utah 1999) (expressing doubt
that Article 36 confers individual rights, but declining to reach issue because defendant's claim
failed for other reasons); United States v. Singh, 59 M.J. 724, 725-26 (N-M. Ct. Crim. App.
2004) (holding that the Vienna Convention does not confer individual rights enforceable by
military courts-martial); State v. Navarro, 659 N.W.2d 487, 491 (Wis. App. 2003) ("we are
convinced that the Vienna Convention does not confer standing on an individual foreign national
to assert a violation of the treaty in a domestic criminal case"); Cauthern v. State, 145 S.W.3d
571, 626 (Tenn. Crim. App. 2004) (concluding that, "for purposes of this post-conviction
proceeding, Article 36 of the Vienna Convention on Consular Relations creates no individual
rights that are privately enforceable"); Kasi v. Virginia, 508 S.E.2d 57, 64 (Va. 1998) (stating
that the provisions of the Vienna Convention do not create an individual right). See generally
Roberto Iraola, Federal Criminal Prosecutions and the Right to Consular Notification Under
Article 36 of the Vienna Convention, 105 W. Va. L. Rev. 179, 211 (Fall 2002) (concluding that
"the evolving federal criminal law makes clear, the remedy for an Article 36 violation does not
appear to include any action that would affect the validity of the prosecution and conviction of a
defendant. Instead, the remedy is confined to diplomatic and political interaction, or other action
under international law, between the United States and the country of the foreign national")
(footnote omitted); Mark J. Kadish, Article 36 of the Vienna Convention on Consular Relations:
A Search for the Right to Consul, 18 Mich. J. Int'l L. 565 (Summer 1997) (arguing that the
treaty drafters intended to create an individual right of notification); Ann K. Wooster,
Annotation, Construction and Application of Vienna Convention on Consular Relations (VCCR),
Requiring That Foreign Consulate Be Notified When One of its Nationals Is Arrested, 175
A.L.R. Fed. 243 (2002) (collecting cases).

 Other courts have sidestepped the issue and concluded that remedies such as the
suppression of evidence or dismissal of an indictment are not available even if the treaty does
create individual rights. See Commonwealth v. Diemer, 785 N.E.2d 1237, 1243-45 (Mass. App.
2003), cert. denied, 540 U.S. 1150 (2004) (collecting cases and joining those courts which have
held that suppression of evidence for a Vienna Convention violation is not an available remedy).
37. 2001 I.C.J. 104 (June 27, 2001).
38. 2004 I.C.J. 128 (March 31, 2004).
39. LaGrand, 2001 I.C.J. 104, ¶ 77; Avena, 2004 I.C.J. 128, ¶ 40. 
40. We note that Article 94(2) of the United Nations Charter suggests that ICJ decisions
are not privately enforceable in the courts of the member nations. That article reads as follows: 
"If any party to a case fails to perform the obligations incumbent upon it under a judgment
rendered by the Court, the other party may have recourse to the Security Council, which may, if it
deems necessary, make recommendations or decide upon measures to be taken to give effect to
the judgment." 59 Stat. 1051. Further, Article 59 of the ICJ statute, 59 Stat. 1055, incorporated
into the United Nations Charter, states that "[t]he decision of the [ICJ] has no binding force
except between the parties and in respect of that particular case." Of course, the ICJ deals with
disputes between nations (even though they may address the rights and obligations of a nation vis
a vis private individuals), and only nations are parties to such proceedings. Here, of course,
neither appellant nor El Salvador were parties to the Avena case and therefore that decision is not
binding in this case.
41. 523 U.S. 371 (1998).
42. Id. at 376.
43. The only witness who testified that appellant said he was from El Salvador was Officer
Benavides who interviewed appellant on August 21
st beginning at about 3:05 p.m.
44. During the evening of August 20
th, appellant had received a cell phone call from his
wife and he spoke to her on the phone without any interruption or interference.
45. See Avena, 2004 I.C.J. 128 at ¶ 84 (noting that "Article 1 of the Vienna Convention on
Consular Relations, which defines certain of the terms used in the Convention, offers no
definition of the phrase 'without delay'").
46. See Breard, 523 U.S. at 375 (noting that "while we should give respectful
consideration to the interpretation of an international treaty rendered by an international court
with jurisdiction to interpret such, it has been recognized in international law that, absent a clear
and express statement to the contrary, the procedural rules of the forum State govern the
implementation of the treaty in that State").
47. But see Richard Posner, No Thanks, We Already Have Our Own Laws, Legal Affairs,
July-Aug. 2004, at 40, 42 (arguing that the use of foreign law as authority flirts with the
"discredited" idea of "universal natural law" and noting that the citation of foreign case law "is
one more form of judicial fig-leafing, of which we have enough already" ). 
48. Avena, 2004 I.C.J. 128 at ¶ 79.
49. United States v. Rodrigues, 68 F. Supp.2d 178, 184 (E.D.N.Y. 1999) ("There is no
prohibition anywhere in the Convention against continuing to question a foreign national while
awaiting consular contact"); see also United States v. Alvarado-Torres, 45 F. Supp. 2d at 991;
United States v. Chaparro-Alcantara, 37 F. Supp.2d 1122, 1126-27 (C.D. Ill. 1999). 
50. Id. at ¶ 85.
51. Id.
52. Id. at ¶ 86.
53. Id.
54. Id.
55. Id.
56. Id.
57. Id. ¶ 87. This is not at all surprising as the seminal American case of Miranda v.
Arizona, 384 U.S. 436 (1966), which required that an arrestee be warned of his constitutional
rights to counsel and against self-incrimination, was not delivered until three years after the treaty
was drafted. The Miranda rights are secured under the Fifth and Sixth Amendments to our own
Constitution and are essential to our criminal justice system, but they are by no means universally
recognized or enforced by other nations. See Miranda, 384 U.S. at 442-43 (stating that the Fifth
Amendment's right against self-incrimination "had its origin in a protest against the inquisitorial
. . . methods of interrogating accused persons, which have long obtained in the continental
system") (internal quotations omitted); see also Gordon Van Kessel, European Perspectives on
the Accused as a Source of Testimonial Evidence, 100 W. Va. L. Rev. 799, 810 (1998) (noting
that even today European countries typically do not afford a right to counsel during police
questioning); Diane Marie Amann, A Whipsaw Cuts Both Ways: The Privilege Against Self-Incrimination in an International Context, 45 UCLA L. Rev. 1201, 1251-54 (1998) (discussing
the recent development of a rising right to silence in other nations but noting that this right
generally remains less expansive than the Fifth Amendment right in the United States). There is
no reason to think the drafters of the Vienna Convention had these uniquely American rights in
mind or that they intended these rights to be applied to all nations who were signatories to the
treaty.
58. 2004 I.C.J. 128 at ¶ 87.
59. Consular Notification and Access, Part 3: FAQs. See
http://travel.state.gov/law/consular_748.html.
60. Id.
61. Id.
62. Id.; see also Consular Convention between the United States and the Soviet Union, 19
U.S.T. 5018 art. 12 (state that notification shall be given "immediately"), and Protocol (stating
that notification may be given within one to three days).
63. See 7 Foreign Affairs Manual § 426.2-1 (2004), available at
http://foia.state.gov/masterdocs/07fam/07m0420.pdf.
64. See Bell v. Commonwealth, 264 Va. 172, 185-87, 563 S.E.2d 695, 706 (2002), cert.
denied, 537 U.S. 1123 (2003) (consular notification within 36 hours after defendant taken into
custody was made without delay); United States v. Ore-Irawo, 78 F. Supp. 2d 610, 613 (E.D.
Mich. 1999) (stating that "available authorities suggest that the term 'without delay' [in Article
36] refers to a time-period of one to three days").
65. See, e.g., Tex. Code Crim. Proc. art. 11.15 ("The writ of habeas corpus shall be
granted without delay by the judge or court receiving the petition, unless it be manifest from the
petition itself, or some documents annexed to it, that the party is entitled to no relief whatever");
id. art. 14.051 ("'fresh pursuit' means a pursuit without unreasonable delay by a peace officer of
a person the officer reasonably suspects has committed a felony"); id, art. 14.06 ("the person
making the arrest or the person having custody of the person arrested shall take the person
arrested or have him taken without unnecessary delay, but not later than 48 hours after the person
is arrested, before the magistrate who may have ordered the arrest"); id. art. 15.08 (officer shall
execute telegraphed arrest warrant "without delay"); id., art. 17.30 (magistrate issuing emergency
protective order shall certify proceedings and deliver documents to clerk of the proper court
"without delay"); id. art. 18.06(a) ("A peace officer to whom a search warrant is delivered shall
execute it without delay and forthwith return it to the proper magistrate. It must be executed
within three days from the time of its issuance, and shall be executed within a shorter period if so
directed in the warrant by the magistrate").
66. Tex. Code Crim. Proc. art. 15.17(a).
67. See McGee v. Estelle, 625 F.2d 1206, 1209 (5th Cir. 1980).
68. 500 U.S. 44 (1991).
69. Id. at 56. However, a defendant might be able to show that the delay in a particular
case, although less than 48 hours, was unreasonable.

 In evaluating whether the delay in a particular case is unreasonable, however,
courts must allow a substantial degree of flexibility. Courts cannot ignore the
often unavoidable delays in transporting arrested persons from one facility to
another, handling late-night bookings where no magistrate is readily available,
obtaining the presence of an arresting officer who may be busy processing other
suspects or securing the premises of an arrest, and other practical realities. (70)
70. Id. at 56-57. -
71. Numerous American courts have followed the lead of the First Circuit in Li, and held
that "[i]ndividual defendants deprived of consular notification are not entitled to raise their
treatment as a defense against criminal prosecution." 206 F.3d at 65 (noting, inter alia, that "the
State Department is apparently 'unaware of any country party to any consular convention with
the United States that remedies failures of notification through its criminal justice process'"); see
also United States v. Bustos de la Pava, 268 F.3d at 165 n.6; United States v. Emuegbunam, 268
F.3d at 390-91; United States v. Chaparro-Alcantara, 226 F.3d at 621; United States v.
Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir. 2002); State v. Prasertphong, 206 Ariz. 70, 83 
(Ariz. 2003); State v. Buenaventura, 660 N.W.2d 38, 46-47 (Iowa 2003); Garcia v. State, 17 P.3d
994, 996-97 (Nev. 2001); State v. Martinez-Rodriguez, 33 P.3d 267, 273-74 (N.M. 2001); State
v. Sanchez-Llamas, 108 P.3d 573, 577-78 (Or. 2005).
72. See Rocha, 16 S.W.3d at 23 (Holland, Meyers, Price & Johnson, JJ., concurring)
(stating that although article 38.23 is a "permissible enforcement mechanism for violations of
Article 36 of the Vienna Convention," appellant failed to show any causal connection between
that violation and his oral statements given to the police).
73. United States v. Rodrigues, 68 F. Supp.2d at 184 (collecting cases). In United States v.
Villa-Fabela, 882 F.2d 434, 440 (9th Cir. 1989), the Ninth Circuit set out a more generalized test
for demonstrating actual prejudice for a Vienna Convention violation. Under that test, the
defendant bears the burden of establishing that "(1) he did not know of his right; (2) he would
have availed himself of the right had he known of it; and (3) 'there was a likelihood that the
contact would have resulted in assistance to him.'" Id. Under this test, appellant has failed to
establish any of the three required prejudice prongs. Indeed, the record demonstrates that he did
know of his right to contact his consulate from his prior aggravated robbery plea; he never stated
or suggested that he would have requested the police to inform the Salvadoran consulate of his
detention; and the Salvadoran consulate did not send an official to testify at appellant's trial
concerning what assistance they could or would provide to their nationals detained in Texas.
74. See Rodrigues, 68 F. Supp. 2d at 184.
75. Appellant does not cite, and we are unable to find, any precedent that holds that a
violation of the Vienna Convention, unconnected to any showing of prejudice, requires judicial
relief in the form of evidence suppression, retrial, or modification of a sentence. See e.g..
Breard, 523 U.S. at 377 (stating that "it is extremely doubtful that the violation should result in
the overturning of a final judgment of conviction without some showing that the violation had an
effect on the trial" and noting that defendant's trial attorneys "were likely far better able to
explain the United States legal system to him than any consular official would have been");
United States v. Cardenas, 405 F.3d at 253-55 (defendant failed to show that he was harmed by
any lack of consular notification); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1196
(11th Cir. 2000) (defendants not entitled to relief for alleged Vienna Convention violation when
they failed to show how their rights were prejudiced); United States v. Ortiz, 315 F.3d 873, 887
(8th Cir. 2002) (concluding that the "record contains no evidence that violations of the Vienna
Convention in the case of these defendants prejudiced them in any way. That violations occurred
is a fact, but it is a disembodied fact. Courts have no authority to enforce the law, including
treaties, in a vacuum, so to speak").

 In Avena, for example, the ICJ concluded that an appropriate remedy for a violation of
Article 36 is a review to determine whether that violation "caused actual prejudice to the
defendant in the process of administration of criminal justice." Avena, 2004 I.C.J. 128 at ¶ 121.
76. Mendoza v. State, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002); Dinkins v. State, 894
S.W.2d 330, 353-54 (Tex. Crim. App. 1995). 
77. Appellant also argues on appeal that his statements were involuntary due to his "fear of
police," his "fear of Mr. Cubas," and "the circumstances under which he was held." Appellant
did not advance these arguments when he requested the 38.23 instruction at trial; thus, we
decline to address them on appeal. T
EX. R. APP. P. 33.1. 
78. Det. Ortiz testified at the pretrial hearing on the motion to suppress that he took
appellant into custody at 1:10 a.m., after a check of his criminal status revealed that he had a
"warrant for a Motion to Adjudicate."
79. Defense counsel cross-examined the officers regarding the terminology they used when
they read appellant his rights. They acknowledged that they used the term "consejo," a Spanish
word for "advice," instead of "advertencia," a Spanish word for "warning." Appellant, however,
presented no evidence at trial that the terms used by the officers misled him in any way. Officer
Chavez testified that he generally uses these terms interchangeably, and that appellant appeared
to understand that he was receiving his legal warnings. Further, a court interpreter testified at the
pretrial hearing on the motion to suppress that "consejo" is frequently used for the word
"warning" in courtrooms and in the legal system.
80. 530 U.S. 466 (2000).
81. 536 U.S. 584 (2002).
82. Rayford v. State, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003), cert. denied, 125 S. Ct.
39 (2004); Hankins v. State, 132 S.W.3d 380, 386 (Tex. Crim. App.), cert. denied, 125 S. Ct. 358
(2004).
83. Rayford, 125 S.W.3d at 534. 
84. Appellant alleged a number of other grounds in his motion for new trial, but on appeal
he provides argument and authority to support only his claim of cruel and unusual punishment
under the Eighth and Fourteenth Amendments. T
EX. R. APP. P. 38.1. 
85. King v. State, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000). 
86. Tex R. App. P. 21.9.
87. State v. Hight, 907 S.W.2d 845, 846 (Tex. Crim. App. 1995); State v. Bates, 889
S.W.2d 306, 310 (Tex. Crim. App. 1994).
88. Faulder v. Johnson, 99 F. Supp. 2d 774, 777 (S.D. Tex. 1999); White v. Johnson, 79
F.3d 432, 440 n. 2 (5th Cir. 1996).
89. T
ex. R. Evid. 404(b); Montgomery v. State, 810 S.W.2d 372, 387-88 (Tex. Crim. App.
1991) (op. on reh'g).
90. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). 
91. Montgomery, 810 S.W.2d at 387; Mozon v. State, 991 S.W.2d 841, 846 (Tex. Crim.
App. 1999). 
92. The trial court instructed the jury that it could only consider the extraneous offense "in
determining the intent or knowledge of the defendant, if any, in connection with the offense, if
any, alleged against him in the indictment and for no other purpose." 
93. Brooks v. State, 990 S.W.2d 278, 288 (Tex. Crim. App. 1999); Raby v. State, 970
S.W.2d 1, 6-7 (Tex. Crim. App. 1998).