In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1409

United States of America,

Plaintiff-Appellee,

v.

Michael C. Renner,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-10021-001--Michael M. Mihm, Judge.

Argued September 21, 2000--Decided January 2, 2001

Before Easterbrook, Diane P. Wood, and Williams, Circuit
Judges.

Diane P. Wood, Circuit Judge.  Michael Renner was
convicted by a jury of defrauding the bank at
which he worked, in violation of 18 U.S.C. sec.
1344, and sentenced to 32 months of
incarceration. The fraud involved issuing
unlawful letters of credit for the benefit of
joint ventures of his superiors at the bank. He
now appeals the district court's denial of
several of his pre-trial motions as well as the
jury instructions, arguing that the district
court's actions violated his constitutional
rights of due process, compulsory process, and
trial by jury. We find no reversible error with
regard to any of these challenges and therefore
affirm the conviction.

I

Renner was the senior vice president for
commercial loans at Community Bank of Greater
Peoria ("the Bank"). The Bank was owned by a
holding company, which itself was owned by C.
Raymond Becker and John Dailey. Becker served as
the Bank's board chairman; Dailey served as its
CEO. Beginning in the mid-1980s, Becker and
Dailey became involved in several joint ventures
for the purpose of developing shopping centers in
Florida and Arizona as well as other commercial
ventures in Iowa.

In 1986, after these joint ventures reached their legal borrowing limits, Dailey, Renner, and others initiated a scheme by which they caused the Bank to secretly issue unrecorded letters of credit (LOCs) to help finance their ventures. Both the issuance of these LOCs and the failure to book them violated various federal and state banking laws. Specific irregularities included the facts that no one ever required any applications for the LOCs, no promissory notes were signed, and Becker never paid any fees for the unrecorded letters of credit.

The scheme came to an end in June 1993, when in the process of investigating an unrelated matter an examiner for the FDIC discovered two unrecorded LOCs issued by the bank over Renner's signature. As that investigation continued, Dailey confessed to the LOC scheme and approximately 45 unrecorded LOCs were recovered from a drawer of Renner's desk at the Bank. The FDIC, the IRS, and the FBI began a new investigation; Dailey and Becker resigned. By this time, the scheme had resulted in a loss in excess of $4,900,000 and the demise of the Bank.

In time, Dailey and Renner were both charged with knowingly executing a scheme to defraud a financial institution, in violation of 19 U.S.C. sec. 1344. Dailey pleaded guilty and testified for the government at Renner's trial. Throughout the trial, Renner argued he was simply an innocent dupe for Dailey and Becker, who actually issued the LOCs. He protested that he knew nothing of the larger scheme. The jury saw things otherwise and returned a guilty verdict on September 8, 1999. Renner was later sentenced to 32 months of incarceration. He now argues that the district court's jury instructions and its denial of several of his pre-trial motions denied him his constitutional rights of due process, trial by jury, and compulsory process.

II

Renner was indicted on twelve counts of bank fraud. Paragraph Eight of the indictment charged that Renner, "in order to execute and attempt to execute the scheme, knowingly caused the Bank to issue letters of credit . . . for the benefit of the [listed] Businesses . . . , and in violation of Bank and regulatory policy, caused the existence of such letters of credit not [to] be recorded properly on the books and records of the Bank." The crux of Renner's argument is that this language required the government to prove two distinct things: first, that Renner caused the Bank to issue the LOCs, and second, that he failed properly to record them after they were

issued.

From that premise, Renner first argues that Jury Instruction No. 4 failed properly to define this two-part scheme with which he had been charged. Instruction No. 4, however, told the jury that "the 'scheme' mean[t] the illegal extension of credit by reason of letters of credit unbooked on the books and records of Community Bank of Greater Peoria." Renner reasons that this instruction deprived him of his due process rights because it allowed the jury to find guilt based only on his failure to record the LOCs, regardless of whether he issued the LOCs. To similar effect, Renner also argues that the jury instructions impermissibly amended the indictment, thus depriving him of his right to a jury trial.

Although there was some initial confusion about the point, our review of the trial record satisfies us that Renner properly preserved his objections to the jury instructions at the trial level. Thus, in evaluating the challenged jury instructions, this court reviews the charge in its entirety to examine whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues. United States v. Lanzotti, 205 F.3d 951, 956 (7th Cir. 2000). Whether the trial judge amended the indictment is a matter of law, which is reviewed de novo. United States v. Pigee, 197 F.3d 879, 885 (7th Cir. 1999).

We are unpersuaded by Renner's challenge to Instruction No. 4 for two reasons: first, his reading of that instruction is too narrow, and more importantly, he has ignored the cardinal rule in this area, which is that the jury instructions must be examined as a whole. The indictment charges that Renner "knowingly caused" the Bank to issue unrecorded and illegal letters of credit. It does not charge that he actually made the initial underwriting decision, nor that he was the sole person with the power to authorize an extension of credit. It states only that he knowingly caused at least some part of the scheme to take place.

In the end, of course, neither Renner nor any other individual person actually issued the LOCs; they were issued by the Bank as an institution. LOCs are commitments by a bank that are specifically designed to facilitate commercial transactions by putting the bank's credit on the line either for payment (with documentary credits) or for a guarantee (with standby credits, as these appeared to be). Before the LOC could be issued by the Bank, the signature of

some official of the Bank had to be on the document. Here, it is undisputed that Renner signed the LOCs in question. To that extent, therefore, he caused the Bank to extend its credit to the beneficiaries of the LOCs. Furthermore, he also failed to book the LOCs properly. Instruction 4 mentions both these points--the illegal extension of credit by reason of letters of credit, and the failure to book those same letters of credit. It is also worth noting that the jury was expressly instructed that the phrase "to extend credit" meant "'to make or renew any loan' (including letters of credit)." In short, even if the instruction was not a model of clarity, it was not inconsistent with the indictment.

Furthermore, Instruction No. 4 was only a description of the alleged "scheme." Even if Renner is correct that Instruction No. 4 by itself either inadequately or confusingly describes his role in the scheme, other instructions cure that problem. The jury was instructed that the government had to prove the following elements beyond a reasonable doubt:

First, that there was a scheme to defraud a bank as charged in the indictment;

Second, that the defendant executed or aided the execution of the scheme;

Third, that the defendant did so knowingly and with the intent to defraud.

The jury was also told about the required mental state:

You are further instructed that for the Defendant Michael Renner to have acted with the intent to defraud means that he acted knowingly and with the intention or the purpose to deceive or to cheat.

Finally, the court defined knowledge for them:

When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find the defendant had a strong suspicion that things were not what they seemed or a strong suspicion that someone had withheld some important facts, yet shut his eyes for fear that

he would learn, you may conclude he acted knowingly. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

Taken as a whole, these instructions properly informed the jury that it had to find (1) a scheme in which illegal credit was extended by means of unrecorded LOCs and (2) that Renner knowingly participated in the execution of this scheme. See Lanzotti, 205 F.3d at 956 (appeals court should review the jury charge in its entirety to determine error). Whether Renner "knowingly executed or aided" the scheme, as stated in the instructions, is functionally the same question as whether he "knowingly caused" the scheme, as stated in the indictment. The jury instructions do not have to mirror the words of the indictment--the concern is that the defendant be able to rely on the indictment in making his defense. See United States v. Miller, 471 U.S. 130, 136 (1985).

Renner has emphasized his objection to Instruction No. 4 so strongly because his entire defense focused on the fact that he personally did not make the initial decision to extend the credit. But the government's case did not depend on proof that he did so. The indictment did not charge him with actually making the initial decision to issue the credit, but instead merely with playing a part in the scheme. By signing the LOCs before they were issued, failing to book them in order to promote the fraud, and hiding them in his desk drawer, he knowingly caused the extension of credit just as much as if he had taken the first step or two in the process that led to their issuance.

For the sake of completeness, we add that Renner's concession in his brief that, had the indictment charged him with aiding and abetting, the jury instructions would have been proper, was fatal in any event to his appeal. Every indictment implicitly includes an aiding and abetting charge; it is unnecessary for an indictment specifically to mention 18 U.S.C. sec. 2. See United States v. Gooch, 120 F.3d 78, 81 (7th Cir. 1997). Accordingly, the jury was instructed that, in order to sustain the charges, it had to find a scheme to defraud and that the defendant executed or aided in the extension of the scheme knowingly and with the intent to defraud. The jury was also given a separate aiding and abetting instruction.

Thus, we find that the district court's jury instructions did not mislead the jury on the government's burden of proof or otherwise impermissibly amend the indictment.

III

Renner filed several unsuccessful pre-trial motions regarding immunity of two defense witnesses and their later invocation of the Fifth Amendment privilege against self-incrimination. He also unsuccessfully sought the introduction of a statement made by an Assistant U.S. Attorney at a pre-trial hearing that seemed to vouch for Renner's own truthfulness. He now argues that the district court's denial of these motions violated his rights to compulsory process. We disagree; the district court did not abuse its discretion in denying any of these motions.

IV

For these reasons, we hold that the procedures followed by the district court did not deny Renner his rights to due process, trial by jury, or compulsory process. Accordingly, the judgment of conviction is

Affirmed.