

## NUMBER 13-11-00442-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**DAVID SAMARIPAS JR.,**                             **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                  **Appellee.**

---

### On appeal from the 272nd District Court
### of Brazos County, Texas.

---

## OPINION[1]

### Before Justices Rodriguez, Benavides, and Perkes
### Opinion by Justice Perkes

Appellant, David Samaripas Jr., appeals his conviction for the offense of engaging in organized criminal activity, habitual offender. *See* TEX. PENAL CODE ANN. § 71.02(a) (West 2011).[2] The jury found appellant guilty of the offense and that he used

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

[2] Appellant was previously tried and found guilty for this offense. *Samaripas v. State*, No. 10-09-00044-CR, 2010 Tex. App. LEXIS 812 (Tex. App.—Waco 2010, pet. ref'd) (mem. op., not designated for

or exhibited a deadly weapon, namely a firearm, during its commission. Enhanced by two prior offenses,[3] the jury assessed punishment at fifty-three years confinement in the Texas Department of Criminal Justice, Institutional Division. By four issues, appellant contends that: (1) the evidence is insufficient to prove that the offense was committed with the intent to establish, maintain, or participate as a member of a criminal street gang; (2) the trial court abused its discretion in limiting appellant's voir dire examination of a veniremember; (3) the trial court erred by instructing the jury on the law of parties; and (4) appellant's sentence was improperly enhanced with a state jail felony conviction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:30 a.m. on October 7, 2007, Onelia Lara exited the house located at 1605 South College in Bryan, Texas. Immediately after closing the door, Lara felt uneasy because she saw a Chevrolet Suburban on the street and "a little black car" with its headlights turned off directly behind the Suburban. Lara walked toward her green Toyota Avalon. Suddenly, gunshots were fired in rapid succession from the front passenger side of the Suburban. Lara ducked behind her car as several shots were fired in her direction, hitting the house and a car parked in front of the house.

Inside the house, Joe Luis Lopez heard the gunshots and the bullets "going through the house." Lopez looked out the window and observed a "light-color SUV" driving away with its passenger side facing the house. Lopez ran outside. A police car

---

publication). The Waco Court of Appeals, after concluding that appellant was egregiously harmed by errors in the charge to the jury, reversed and remanded the case for a new trial. *Id.* at *19.

[3] *See* TEX. PENAL CODE ANN. § 12.42(d) (West 2011).

2

arrived within seconds, and Lopez told the officers in which direction the Suburban had driven. The officers drove away in that direction.

Officers Steve Spillars and Mahoney[4] were the officers in the police car. They were patrolling in that part of town because of recent gang violence in the area. The two most prominent street gangs in Bryan, Texas at that time were the "Surenos" and the "Latin Kings." The two gangs were rivals. The residence at 1605 South College was considered "a known gang member house." Andrew Lopez-Lucio, a Surenos member, lived at 1605 South College. Lara, who was "associated" with the Surenos, was his girlfriend, and Lopez, also a Surenos member, was his brother.

Just hours before this shooting, a Latin Kings member shot four Surenos members or affiliates, who were taken to the emergency room at Bryan's Saint Joseph's Hospital. An injured member of the Latin Kings was also at the hospital. Lucio had shot him a few days earlier. At approximately 11:00-11:30 p.m. that night, a different Surenos member was shot while leaving the hospital. The police were notified that a black car was connected to that shooting.

Officer Spillars is a member of Bryan's Police Department's "Directed Deployment Team" (DDT), a vice unit that investigates street gangs and keeps databases of known gang members. On the night of October 6, Officers Spillars and Mahoney were assigned to patrol certain areas of town, including the 1600 block of South College in Bryan. At approximately 1:30 a.m. on October 7, the officers were about three blocks away from 1605 South College. Upon hearing the gunshots, they rushed toward the 1600 block of South College.

---

[4] Officer Mahoney's first-name was not provided in testimony.

Lopez described the Suburban to Officer Spillars and told him the direction in which it drove away. Driving in that direction, the officers saw a Suburban matching Lopez's description about a half mile away. The officers, now joined by another police unit, "initiated a traffic stop by turning on our overhead lights." The Suburban did not stop.

Officers Spillars and Mahoney pursued the Suburban as it made frequent turns, ran a red light, drove through residential areas of town, and then drove on a highway heading toward Burleson County at speeds "[r]ang[ing] from 60 miles an hour to 90 miles an hour." As the Suburban crossed the bridge over the Brazos River, Officer Spillars saw "something" get thrown out the front passenger window, over the rail, and toward the Brazos River. The chase continued into Burleson County, but dispatch had already informed deputies in that county that the chase was "fast approaching their location." The deputies placed "stop sticks"[5] on the highway. The Suburban ran over the stop sticks and eventually came to a stop. Jeronimo Guedea Jr. (a/k/a Gudea)[6] was the driver, and appellant was the front seat passenger.

On the following day, Officer William Joseph Cross of the Bryan Police Department was dispatched to the Brazos River near the bridge to recover the item that had been thrown from the Suburban during the chase. Officer Cross found a black zipper bag with the words "ConvaTec Ostomy Care" on it on a bank of the river. Officer

---

[5] Officer Spillars explained that "stop sticks" contained hollow, pointed steel rods that, when driven over, punctured a vehicle's tires, causing the tires to deflate.

[6] The spelling of Guedea's name varies in the record. "Gudea" appears in the heading introducing his testimony. References to him in other testimony and exhibits are spelled "Guedea."

Cross opened the colostomy bag and found a black nine-millimeter Beretta handgun, three firearm magazines, a cell phone, and two quarters.

The colostomy bag belonged to appellant. He had been shot about one month before this event during an altercation between Surenos and Latin Kings members. As a result of his injury, appellant began using a colostomy bag. A police investigation into appellant's injury resulted in Lucio's arrest and subsequent indictment for engaging in organized criminal activity. The underlying offense for that charge was Lucio's assault on appellant. Appellant informed the investigating officer that Lara had also been present at that altercation. Detective Lance Matthews, a detective with the Criminal Investigations Division at the Bryan Police Department, was the investigating officer in that shooting, and he provided testimony at appellant's trial regarding the details of that investigation.

Officer Mike Kneese works in the Criminal Intelligence Unit at the Bryan Police Department. He testified as an expert on criminal street gangs and told the jury that appellant was a member of the Latin Kings. Emil Carlos Garza Sr., a "Program Supervisor One with the Security Threat Management Office" at the TDCJ, also testified that appellant was a member of the Latin Kings. Detective Stephen Fry, who works in the Major Crimes Unit in the Criminal Investigations Division of the Bryan Police Department, testified to what appellant told him during appellant's post-arrest interview.[7] Among other things, appellant told Detective Fry that Guedea was not involved in the offense.

---

[7] Appellant waived his Miranda rights and talked freely with Officer Fry.

5

Officer Jean Guzman works in the Patrol Division of the Bryan Police Department. She testified that she found eleven cartridge cases on the side of the street where 1605 South College was located—the side of the street that the passenger side of the Suburban had faced. Jamie Becker, a firearm and tool mark examiner working as a senior criminalist at the Tarrant County Medical Examiner's Office, testified that the Beretta handgun shot the bullets and ejected the cartridge cases recovered from the crime scene. A DVD recording, which was recorded by a camera in Officer Spillars's patrol unit, was played for the jury. Guedea testified, claiming all responsibility for the shooting and flight from the police.

The jury found appellant guilty of engaging in organized criminal activity. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By his second issue,[8] appellant argues that the evidence was insufficient to prove that the offense was committed with the intent to establish, maintain, or participate as a member of a criminal street gang. We disagree.

### A. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality

---

[8] We reorganized appellant's issues so as to first address the issue seeking the greatest relief.

op.).  The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony.  *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)).  Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province.  *Id.*  (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)).  We must resolve any inconsistencies in the testimony in favor of the verdict.  *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.  *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.  *Id.*

A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit one or more of certain enumerated offenses.  TEX. PENAL CODE ANN. § 71.02(a) (West 2011); *see Smith v. State*, 36 S.W.3d 908, 909 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).  Relevant to this appeal, one of the enumerated offenses is "Deadly Conduct," and one of the manners in which a person commits "Deadly Conduct" is by knowingly discharging a firearm at or in the direction of one or more individuals or a

7

habitation or vehicle and being reckless as to whether the habitation or vehicle is occupied. *See* TEX. PENAL CODE ANN. §§ 22.05(b), 71.02(a) (West 2011).

**B.    Analysis**

Appellant does not dispute being a member of the Latin Kings or even that he was the actor who committed the deadly conduct offense. Appellant challenges the sufficiency of the evidence to show that he acted with the intent to establish, maintain, or participate in a criminal street gang, namely the Latin Kings. Appellant contends that the evidence, at best, supports a conclusion that the offense was a retaliatory assault or a private vendetta by appellant against Lucio, the person who had shot appellant one month earlier.

It is true that in order to sustain appellant's conviction, the evidence must prove more than that he was a gang member and committed one of the enumerated offenses; the evidence must satisfy both of the statute's mental-state requirements: the mental state for the commission of the enumerated offense and the mental state to establish, maintain, or participate in the criminal street gang. *See Hart v. State*, 89 S.W.3d 61, 63–64 (Tex. Crim. App. 2002) (en banc); *see also Zavala v. State*, Nos. 13-10-00254-CR, 13-10-00255-CR, 2012 Tex. App. LEXIS 1447, at *13 (Tex. App.—Corpus Christi Feb. 23, 2012, no pet.) (mem. op., not designated for publication). Direct evidence of a requisite intent, however, is not required. *Hart*, 89 S.W.3d at 64. "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime . . . ." *Id.* (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (J. Meyers concurring))

8

(internal quotation marks omitted); *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi 2006, pet. ref'd).

In this case, the jury had sufficient evidence to find that appellant committed the offense with the intent to establish, maintain, or participate in the criminal street gang. Detective Matthews testified about his investigation into appellant's injury that occurred one month before the shooting at 1605 South College. Detective Matthews contacted appellant while he was still in the hospital, but appellant was "uncooperative at that time." Appellant, however, did tell him that he had been shot during an altercation between some Surenos and Latin Kings members. Appellant directed Detective Matthews to a person who could help identify the person who shot appellant. After talking to that person, Detective Matthews obtained an arrest warrant for Lucio for "organized criminal activity with [the] underlying charge being assault or aggravated assault" of appellant. Appellant also mentioned Lara, and later told Detective Matthews that she was "the one going around shooting up people in her little green car."

Appellant later informed Detective Matthews that someone other than Lucio shot him. Appellant told Detective Matthews that he was injured while protecting Lucio and some other Surenos members who were "getting beat up" by some Latin Kings's members. He further told Detective Matthews that he informed one of his friends, "This s__t is getting old. I can't do this s__t because I'm going to retaliate. I'm not y'all. Y'all let this s__t ride. Y'all need to cut it out." The indictment against Lucio was subsequently dismissed for lack of sufficient evidence.

Detective Matthews testified, "[m]ost of the time when we work these gang-involved shootings, we don't get any cooperation by the victim when the victim is a gang

member because they want to retaliate or take care of it on their own." He noted that the Latin Kings follow a code, which includes the rule against cooperating with the police.

Officer Kneese explained that the rule against talking to the police was established to "conceal illegal activity," including retaliation. In Officer Kneese's expert opinion, the motivation for the October 5, 2007 shooting was retaliation against the Surenos. On cross-examination, defense counsel asked Officer Kneese, "[t]he retaliation that we're talking about is essentially Andrew [Lucio] shot David [appellant]; therefore, the Kings are going to shoot up the Sureno house. Is that pretty much your opinion?" Officer Kneese responded, "That's part of it, yes."

Detective Fry also concluded that appellant's response was to retaliate. Appellant told him that he almost got a tattoo on the back of his head "that said '911' scratched out" with "'I retaliate'" written underneath it. Detective Fry testified that appellant told him that he had received a phone call informing him that "the Surenos were giving up names and vehicle descriptions of the people that were involved in that first shooting"—the one that occurred on the evening of October 6. Detective Fry read into evidence the following statement from appellant regarding the Surenos:

> Them motherf___rs are a bunch of a g__d__n wetbacks, illegal alien motherf___rs that are running around here shooting motherf___rs all g__d__n day. And because a motherf___r has too much pride to call the cops and say, hey, they just shot at me, like a little f__king p___y q___r, we're getting jammed up.
>
> . . . .
>
> . . . [Y]ou know how many times them motherf___rs have shot at somebody? You know how many times? . . .

10

. . . .

On two different occasions my s__t got shot up, man. When did y'all ever hear me call y'all? Motherf___r, if you're going to be a G in the g__d__n street, be a motherf__king G. Otherwise, b___h, if you're going to tuck your nuts every time something bad happens to you, get your b___h a__ on, man.

But, what the f__k, he goes to calling y'all. Man, I be honest with you, man. I don't start s__t. I finish s__t, baby. That is my—my—that is my motto. That is the way I keep things. I don't start nothing. I finish.

. . . .

Man, what the f__k, man. I didn't come to y'all, man. I didn't go to y'all, f__king with y'all. I didn't try to get y'all involved. I didn't try to do s__t, man. But these dudes have got a lot of bad coming towards them, man.

Detective Fry explained that "G" means "a gangster," and appellant's comment about "G in the . . . street" reflects the common code amongst gangs to not "call the police [and] keep it in the streets[.]" While discussing the Surenos, appellant frequently used diction such as "us" and "we" when describing the Latin Kings and "they" or "them" when discussing the Surenos. Appellant told Detective Fry that "them" shot him. Appellant informed Officer Fry, "One of them [the Surenos] is going to die before it's all over."

Based on the foregoing evidence, we hold that a rational trier of fact could have found that appellant acted with the intent to establish, maintain, or participate in a criminal street gang. *See Johnson*, 364 S.W.3d at 293–94; *Anderson*, 322 S.W.3d at 405; *see also Samaripas v. State*, No. 10-09-00044-CR, 2010 Tex. App. LEXIS 812 (Tex. App.—Waco 2010, pet. ref'd) (mem. op., not designated for publication). We overrule appellant's second issue.

11

### III. COMMITMENT QUESTIONS ON VOIR DIRE

Appellant argues that the trial court abused its discretion by limiting appellant's voir dire examination of a veniremember. During voir dire, defense counsel asked a veniremember, "What type of evidence would you expect the State of Texas to bring to you in order to convince you that somebody committed an offense beyond a reasonable doubt?" The State objected to the question as an improper commitment question, and the trial court sustained the objection. Defense counsel rephrased the question: "What type of evidence would you expect to hear? What type of evidence do you expect the State of Texas to bring you . . . in an effort to prove to you beyond a reasonable doubt that someone committed an offense?" The State again objected, and the trial court sustained the objection. The following discussion took place at the bench:

**COURT:**    You're going to bind them to a certain level of evidence.

**DEFENSE:**  Just asking them what do they expect the State of Texas to bring them evidence wise.

**COURT:**    I don't have a problem with that question. Ask it that way. Sustained.

. . . .

**COURT:**    I can't let them get committed to a certain proof in order to find somebody.

**DEFENSE:**  I understand that.

Defense counsel again rephrased the question, "In a criminal case . . . what type of evidence would you expect to hear period?" The veniremember responded, "Factual." Defense counsel probed further, "What type of factual evidence . . . ?" Other veniremembers provided examples, such as eyewitness testimony, physical evidence,

12

or expert testimony.  The State objected on the same grounds.  The following exchange took place at the bench:

**COURT:** Make clear to them in your question that your question is predicated that there're [sic] many different kinds of evidence some of it which you can hear, some of which you cannot hear.  In other words, what you're doing now, again, is binding them to hear certain evidence before they can say guilty.

**DEFENSE:** I respectfully disagree, your Honor.  I'm just asking them their expectations for the trial.

**COURT:** Well, phrase it clearly that these may or may not be necessary to find reasonable doubt, please.

**DEFENSE:** Yes, sir.

Defense counsel then informed the venire panel "that these items of evidence that we're talking about here may or may not create reasonable doubt, may or may not convince you beyond a reasonable doubt . . . ."

Assuming without deciding that the trial court abused its discretion by prohibiting defense counsel from asking a proper question about a proper area of inquiry, appellant did not object to the trial court's ruling.  In fact, other than disagreeing with trial court's characterization of the question as a commitment question, defense counsel complied with the trial court's rulings and rephrased the questions to better reflect his expressed intent to elicit the veniremember's general expectations about the trial process. Defense counsel neither discussed nor challenged the ruling's effect on the scope of voir dire until this appeal.  Accordingly, appellant has failed to preserve this issue.

Preservation of error is a systemic requirement that a first-level appellate court should ordinarily review on its own motion.  *See Archie v. State*, 221 S.W.3d 695, 698

13

(Tex. Crim. App. 2007) (citing *Jones v. State*, 942 S.W.2d 1, 2 n.1 (Tex. Crim. App. 2007)).  To preserve error, an appellant must submit a timely objection into the trial-court record.  *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1).  The error alleged on appeal must comport with the objection submitted to the trial court.  *See* TEX. R. APP. P. 33.1(a); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) ("The legal basis of a complaint raised on appeal cannot vary from that raised at trial").  Appellant preserved nothing for review.  *See* TEX. R. APP. P. 33.1(a).  We overrule his first issue.

## IV.  JURY CHARGE

By his third issue, appellant argues that the trial court erred by including an instruction on the law of parties in the jury charge because the law of parties was not alleged in the indictment.  Appellant acknowledges that current law permits a trial court to instruct on the law of parties even if it has not been alleged in the indictment, but appellant asserts that the caselaw establishing this policy is incorrectly decided and violates his statutory and constitutional rights.  We disagree.

### A.    Standard of Review

When an appellate court is presented with an argument that a trial court committed jury-charge error, the reviewing court must conduct a two-step inquiry:  "First, the reviewing court must determine whether the jury charge contains error.  Second, the court must determine whether sufficient harm resulted from the error to require reversal."  *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998) (en banc); *see Benn v. State*, 110 S.W.3d 645, 648 (Tex. App.—Corpus Christi 2003, no pet.).  Once an appellate court finds jury-charge error, it applies one of the two following standards of review:  "Where there has been a timely objection made at trial, an appellate court

14

will search for only 'some harm.' By contrast, where the error is urged for the first time on appeal, a reviewing court will search for 'egregious harm.'"  *Mann*, 964 S.W.2d at 641 (quoting *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)).

## B.     Analysis

"The purpose of the jury charge is to 'apply the law to the facts raised by the evidence.'"  *Benn*, 110 S.W.3d at 649 (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).   The law is well-settled that if the evidence presented at trial supports an instruction on the law of parties, the trial court "may charge on the law of parties even though there is no such allegation in the indictment."  *Pitts v. State*, 569 S.W.2d 898, 900 (Tex. Crim. App. 1978) (en banc); *see Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002) ("[I]t is well-settled that the law of parties need not be pled in the indictment." (citing *Malik v. State*, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997); *Jackson v. State*, 898 S.W.2d 896, 898 (Tex. Crim. App. 1995); *Fisher v. State*, 887 S.W.2d 49, 57 (Tex. Crim. App. 1994); *Swope v. State*, 805 S.W.2d 442 (Tex. Crim. App. 1991); *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989); *Crank v. State*, 761 S.W.2d 328, 352 (Tex. Crim. App. 1988); *Pitts*, 569 S.W.2d at 900))); *Gomez v. State*, 13-09-00619-CR, 2010 Tex. App. LEXIS 10250, at *7–8 (Tex. App.—Corpus Christi Dec. 30, 2010, pet. ref'd) (mem. op., not designated for publication).

Appellant maintains that the case precedent allows the State to constructively amend indictments rather than pursue the statutory amendment process,[9] and to thereby allow a jury to convict a defendant on a non-indicted basis in violation of

---

[9]   *See* TEX. CODE CRIM. PROC. ANN. art. 28.10(c) (West 2006) (providing method to amend indictment).

statutory and constitutional law. Appellant concludes that there is an "irreconcilable conflict" between the principle that a defendant should only be tried for an offense actually alleged in an indictment and the principle that allows for inclusion of the law of parties without being alleged in the indictment. Appellant avers that *Pitts* and its progeny lead to a violation of his right to an indictment in a felony case; his right to full and fair notice of the offense charged under the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Texas Constitution; and his rights under the "Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States" and Article I, Sections 10 and 19 of the Texas Constitution. Appellant further characterizes the policy allowing for instruction on the law of parties without it being alleged in the indictment as inconsistent with articles 21.01[10] and 21.03[11] of the Texas Code of Criminal Procedure and sections 1.07(a)(22),[12] 2.01,[13] and 7.01(c)[14] of the Texas Penal Code.

Appellant supports his constitutional-rights claim by citing *In re Winship*, which states, "[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. 358, 364 (1970). Appellant

---

[10] "An 'indictment' is the written statement of a grand jury accusing a person therein named of some act or omission which, by law, is declared to be an offense." TEX. CODE CRIM. PROC. ANN. art. 21.01 (West 2009).

[11] "Everything should be stated in an indictment which is necessary to be proved." *Id.* art. 21.03.

[12] This section defines "elements of offense." *See* TEX. PENAL CODE ANN. § 1.07(a)(22) (West 2011).

[13] This section requires proof beyond a reasonable doubt for conviction. *See id.* § 2.01.

[14] This section abolished the distinction between accomplices and principals. *See id.* § 7.01(c). This was the section elaborated upon in *Pitts v. State*. *See* 569 S.W.2d at 900.

also references *Apprendi v. New Jersey*, which held that the Sixth and Fourteenth Amendments, "[t]aken together . . . entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" 530 U.S. 466, 477 (2000) (citing *U.S. v. Gauldin*, 515 U.S. 506, 510 (1995); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *In re Winship*, 397 U.S. at 364)).

Appellant's argument is similar to the one made by the defendant in *Soto v. State*, wherein the defendant alleged that "the State's failure to indict him as a party to the offense [and the trial court's instruction on it] violated his constitutional right to due process under *In re Winship*, *Apprendi v. New Jersey* and their progeny." 173 S.W.3d 469, 476 (Tex. Crim. App. 2005). In that case, the court of criminal appeals overruled the defendant's issue, noting that many of the cases supporting the policy that a trial court can instruct a jury on the law of parties without it being alleged in the indictment were decided after *Apprendi*. *Id*. at 476 n.23.

Appellant's argument has already been rejected by the Texas Court of Criminal Appeals and presents nothing new for our review. *See id*. at 476. The policy allowing a trial court to instruct a jury on the law of parties when it has not been included in the indictment is well-established, not only under Texas caselaw, but under federal caselaw as well. *See Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011) (citing TEX. PENAL CODE § 7.01(c); *U.S. v. Osborne*, 286 F.Supp.2d 891, 902 (E.D. Tenn. 2003)); *Marable*, 85 S.W.3d at 292 (citing *U.S. v. Renner*, 238 F.3d 810, 814 (7th Cir. 2001); *U.S. v. Bradstreet*, 135 F.3d 46, 53–54 (1st Cir. 1998); *U.S. v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992); *U.S. v. Clark*, 980 F.2d 1143, 1146 (8th Cir. 1992)).

Here, the evidence warranted an instruction on the law of parties. *See Pitts*, 569 S.W.2d at 900 (permitting instruction on law of parties when evidence supports such instruction). Guedea provided testimony which sought to exculpate appellant of any wrongdoing and which characterized him as a hapless observer who neither knew about nor contributed to the offense; whereas appellant told Detective Fry that Guedea was innocent and sought to exculpate Guedea of the crime. In addition, several police officers testified that appellant and Guedea were active members of the Latin Kings; evidence was found in a colostomy bag belonging to appellant; and the primary victim of the offense was someone whom appellant identified as being affiliated with the Surenos and whom was dating the person who was originally charged with shooting appellant. We overrule appellant's third issue.

## V. SENTENCE ENHANCEMENT

By his fourth issue, appellant argues that the trial court improperly enhanced his punishment under Texas Penal Code section 12.42(d) because one of the convictions used for enhancement was a state jail felony. *See* TEX. PENAL CODE ANN. § 12.42(d) (West 2011). He contends that section 12.42(e) prohibits the use of state jail felonies for enhancement in section 12.42(d). *See id.* § 12.42(d), (e).[15] We disagree.

### A. Standard of Review

Issues of statutory interpretation are reviewed de novo. *See Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008); *Edwards v. State*, 273 S.W.3d 919, 921 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Brooks v. State*, 226 S.W.3d 607, 610

---

[15] Effective September 1, 2011, the Texas Legislature repealed section 12.42(e), incorporated its text into section 12.42(d), and changed the language "punished" to "punishable." *See* Act of May 25, 2011, 82nd Leg., R.S., ch. 834 §§ 4, 6, 2011 Tex. Gen. Laws 834 (current version at Tex. Penal Code Ann. § 12.42(d) (West Supp. 2011)).

(Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *State v. Jimenez*, 148 S.W.3d 574, 576 (Tex. App.—El Paso 2004, pet. ref'd)); *see also Sims v. State*, 84 S.W.3d 768, 779 (Tex. App.—Dallas 2002, pet. ref'd) (applying de novo review in considering propriety of prior offense for use in sentencing enhancement). "When interpreting statutory language, we focus on the collective intent or purpose of the legislators who enacted the legislation," starting with the text itself, which "provides the best means to determine the fair, objective meaning of that text at the time of its enactment." *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011) (citing *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)) (internal quotation marks omitted). We construe an unambiguous statute according to its plain meaning, unless such construction creates an "absurd result." *Id.* (citing *Boykin*, 818 S.W.2d at 785–86).

## B.    Analysis

Appellant's indictment alleged two prior convictions for enhancement purposes. Appellant pleaded "true" to the first offense, but "not true" to the second offense—a state jail felony for evading arrest. *See* TEX. PENAL CODE ANN. § 38.04 (West 2011). The trial court admitted into evidence the indictment and judgment for appellant's evading arrest conviction. The indictment for that offense alleged that appellant used a deadly weapon, namely his vehicle, while fleeing from a peace officer, and it included two prior offenses for enhancement. As a result of a plea bargain, the State did not pursue a deadly weapon finding. In that case, appellant pleaded "true" to the enhancement and the offense was punished as a second-degree felony. *See id.* § 12.42(a)(2).

During the punishment phase, appellant objected to the trial court's admission of his evading arrest conviction on the grounds that it was a state jail felony. Appellant argued that Section 12.42(e) precludes the use of state jail felonies from being used for enhanced punishment under section 12.42(d). Section 12.42(e) provides:

> A previous conviction for a state jail felony punished under Section 12.35(a) may not be used for enhancement purposes under Subsection (b), (c), or (d).

*Id.* § 12.42(e). Section 12.42(d) states:

> [I]f it is shown on the trial of a felony offense other than a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction he shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years.

*Id.* § 12.42(d). The trial court deferred its decision on the matter. During the punishment phase, the court admitted copies of the evading arrest indictment and judgment. Appellant renewed his objection before the court charged the jury. The court overruled his objection. The jury found both prior offenses to be true, and appellant was assessed punishment as a habitual offender under Texas Penal Code section 12.42(d).

Much of appellant's argument is premised upon the principle that an enhanced punishment under section 12.42(a)(2) increases the range of punishment, but not the degree of the primary offense. *See Ford v. State*, 334 S.W.3d 230, 234 (Tex. Crim. App. 2011) (holding that the language "shall be punished," which appears throughout section 12.42, indicates that only punishment is enhanced and not the offense level).[16]

---

[16] Appellant's reliance on *Fite v. State*, 60 S.W.3d 314 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd), *Arriola v. State*, 49 S.W.3d 374 (Tex. App.—Fort Worth 2000, pet. ref'd), and *Hadnot v. State*, 851, S.W.2d 378 (Tex. App.—Houston [1st Dist. 1993, writ ref'd) is misplaced. Those cases analyzed the

Appellant contends that his prior state jail felony, which received enhanced *punishment* under section 12.42(a)(2), remained a state jail felony and could not therefore be used for enhancement under 12.42(d).

The language included in section 12.42(e) is different from the "shall be punished" diction analyzed in *Ford*, a case concerning multiple enhancement (i.e. offense level and applicable punishment range) by a prior offense. *See Ford*, 334 S.W.3d at 231–32. Section 12.42(e) prohibits use of a "state jail felony *punished under* Section 12.35(a)" for enhancement under section 12.42(d). *See* TEX. PENAL CODE ANN. § 12.42(e) (West 2011) (emphasis added). However, appellant's prior state jail felony conviction was not punished under 12.35(a), but rather under 12.42(a)(2). The proscription in section 12.42(e) is therefore inapplicable. Nothing in subsections (d) or (e) of section 12.42 precludes the use of a state jail felony for enhancement if the state jail felony was not punished under section 12.35(a). *See id.* § 12.42(d), (e).

By definition, a state jail felony is a felony. *See id.* § 12.04(a)(5). Unless otherwise excluded, state jail felonies qualify as a "previous felony conviction" in section 12.42(d). *See id.* § 12.42(d); *see also Campbell v. State*, 49 S.W.3d 874, 876 (Tex. Crim. App. 2001) (en banc) (allowing for a "more specific 'state jail felony'" to be carved out from "the more general 'felony'" where the statutory language requires it). Punishing a defendant more severely after repeated behavior that has escalated beyond the level of an unenhanced state jail felony offense is neither absurd, nor is its application. Had the Legislature intended to exclude state jail felonies that received enhanced

---

effect of Texas Penal Code Section 12.44(a), which provides a trial court discretion to punish a state jail felony as a misdemeanor on subsequent enhancement. *See* TEX. PENAL CODE ANN. § 12.44(a) (West 2011). We decline appellant's invitation to extend our sister courts' interpretations of that statute to a context which is beyond the scope of those opinions.

punishment under section 12.42(a)(2) from being used for enhancement, it would have done so. Instead, the Legislature delineated a very specific subcategory of state jail felonies for exclusion. *See* TEX. PENAL CODE ANN. § 12.42(e) (West 2011). We overrule appellant's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Publish
TEX. R. APP. P. 47.2 (b)

Delivered and filed the
17th day of January, 2013.