**AFFIRMED; Opinion Filed October 20, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01271-CR

**RUTH BARRADAS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1263141-U**

# MEMORANDUM OPINION

Before Justices Fillmore, Stoddart, and Richter[1]
Opinion by Justice Stoddart

A jury convicted Ruth Barradas of capital murder and the trial court sentenced her to life imprisonment without parole. In six issues, Barradas argues: (1) the evidence is insufficient to prove she is a party to the capital murder; (2) the evidence is insufficient to prove she is guilty as a co-conspirator; (3) the trial court erred by failing to inform prospective jurors about section 12.31(b) of the penal code; (4) the trial court erred by failing to limit the statutory acts constituting party liability in the application paragraph of the jury charge; (5) the trial court erred by including a definition of reasonable doubt in the jury charge; and (6) the trial court lacked jurisdiction to hear the case and render judgment. We affirm the trial court's judgment.

---

[1] The Hon. Martin Richter, Justice, Assigned

Omar Zeballos lived with Olivia Arvizu, the decedent, who he considered his wife. They did not have a bank account and instead kept cash in their house. Zeballos and Arvizu knew Ruth Barradas for many years and loaned money to her several times when Barradas needed it to pay her rent. They also knew members of Barradas's family.

Barradas's sister-in-law, Angelica Cruz, invited Zeballos and Arvizu to her house to have lunch frequently, but Zeballos and Arvizu consistently declined the invitations. Eventually, they accepted a lunch invitation. On December 5, 2012, Zeballos and Arvizu went to lunch at Cruz's house where she lived with other people, including Barradas. Although Barradas's car was at the house when Zeballos and Arvizu arrived, Cruz told them no one else was at home. Zeballos had approximately $5,000 in cash in his pocket when they went to lunch.

Several things about being at Cruz's house seemed odd to Zeballos; he became suspicious and nervous. When Cruz served Zeballos his food, he went to the bathroom before eating. By the time he returned, the table had been cleared. Zeballos wanted to leave the home, but his wife said they needed to stay "to hear something very important [Cruz] was going to tell us."

Cruz instructed Zeballos and Arvizu to sit in the living room. Cruz left the room and, after a few minutes, Barradas appeared wearing a hoodie sweater with the hood up; her hands were inside her pockets. Zeballos asked Barradas why she was "dressed like a gang member or something" and Barradas said "no" in a very serious, angry voice. Zeballos testified Barradas did not normally dress "like a gang member."

Approximately two minutes passed before Cruz returned with a man following her. Zeballos testified he had never seen the man before. He later learned the man was Valentin Carus. Zeballos described what occurred next: "[Carus] came up next to my wife. [Cruz] moved

to the side. And [Carus] pulled out his hand, and I could hear the sound of like a spray, something being sprayed. . . . Well, [Carus] sprayed me [sic], and then he turned his hand towards me and sprayed me in the face too. And I felt a little bit, and then I felt him hit me in the head with something." Zeballos testified the spray was pepper spray, which made it difficult to see and breathe. Carus hit him in the head twice with a piece of metal. Carus also sprayed Arvizu.

Zeballos was able to see Barradas standing next to his wife. Barradas and Cruz each grabbed one of Arvizu's arms "[a]nd they began to laugh, to laugh and to shout. And they said, 'What, what what?'" Carus looked to Barradas for direction. Barradas nodded her head up and down and said "Now." Zeballos testified: "And [Carus] went and hit her in the head with a piece of metal he had."

Zeballos answered affirmatively when the State asked: "You saw Ruth Barradas hold your wife still while Valentin took that metal and used it on her; is that right?" Carus hit Arvizu hard on the rear right side of her head with the metal iron. Zeballos could see his wife's head "was smashed in a little bit." Just before she was hit, Arvizu was yelling and covering her face. After she was hit, Arvizu fell and stopped shouting.

Zeballos escaped out of a window. Carus followed Zeballos outside with the piece of metal in his hand. "[Carus] wanted to hit me on the head." Zeballos moved and Carus hit him on the shoulder and arm, breaking Zeballos's arm. Zeballos was able to stand and he went to a nearby house. Carus followed him and "[a]ll the time he was hitting me on the head with the piece of metal, all the time on the head." Zeballos tried to escape from Carus and tried to shield his head from the blows.

Eventually Barradas came out of the house holding a long wooden stick. Barradas ordered Zeballo to return to the house. She said: "Hey, don't make a fuss. Go back to the house.

[Your wife] is waiting for you there." Zeballo replied that he would not return to the house and so Barradas told him: "Then we are going to drag you." Barradas then set the stick down and instructed Carus to pull and drag Zeballos back to the house. They were discussing Barradas's instructions when the police arrived.

Zeballo was taken to the hospital. His left arm was broken and he had cuts on his face. His wife was dead after being hit on the head twenty-one times.

Two neighbors testified they saw two men fighting in the street. The younger man was hitting the older man on the head. Eventually they saw a woman come out of a house. The woman did not have anything in her hands. The woman and the younger man tried to help the older man stand up, but were unsuccessful.

The police found Arvizu's body propped against a couch inside the house. There were two couches in the room, and both were bloodstained. They also found a knife blade and a metal gear underneath couch cushions. The metal gear had blood on it consistent with Arvizu's DNA profile. Outside, the police found a metal gear and a wooden stick, which contained Zeballos's blood.

The police interviewed Barradas who had blood on her shirt and hands. While Barradas was in the interview room alone, she was seen cleaning her hands and shoes with the water given to her to drink. The officer who interviewed her at the station found her actions "extremely suspicious. Very suspicious. Destroying evidence. Blood that's - - or evidence relevant to the case."

During her interview, Barradas told the police that Cruz, Carus, and she planned to rob Zeballos, but not to kill anyone. She said Zeballos bragged about having a lot of money and would post pictures of money-filled suitcases on Facebook. They believed Zeballos would not report the robbery to the police because his money was obtained illegally. They planned to spray

–4–

Zeballos with "gas," which Barradas bought with Carus. Barradas planned to spray the gas because she did not want to hit Zeballos and his wife. The plan called for Carus and Cruz to hit them in order to "stun them." Barradas knew Carus and Cruz had placed a stick, a tube, and a weight in the house. In her interview, Barradas claimed she sprayed Zeballos and Arvizu and then returned to her bedroom. Eventually she went outside to see about the men fighting. She stated several times they did not plan to kill either Zeballos or Arvizu.

LAW & ANALYSIS

**A. Sufficiency of the Evidence**

In her first two issues, Barradas challenges the sufficiency of the evidence. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). As the fact finder, the jury is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the jury's determination of credibility, and may not substitute our judgment for that of the jury. *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). When there is conflicting evidence, we must presume the factfinder resolved

–5–

the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

In her first two issues, Barradas argues the evidence is insufficient to prove any of the modes of party liability contained in the jury charge and to show she is guilty as a co-conspirator. The abstract portion of the trial court's charge includes language consistent with Texas Penal Code sections 7.02(a)(2) and 7.02(b). *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), (b). The trial court instructed the jury that a person is "criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *See id.* § 7.02(a)(2). The court further instructed that "if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy." *See id.* § 7.02(b). Because the charge authorized the jury to convict on alternative theories—as a party or as a conspirator—the jury's verdict will be upheld if the evidence is sufficient on either of those theories. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *Vittatoe v. State*, No. 05-12-01679-CR, 2014 WL 1022425, at *6 (Tex. App.—Dallas Feb. 25, 2014, no pet.) (not designated for publication); *Warren v. State*, No. 05-12-00916-CR, 2013 WL 3717802, at *3 (Tex. App.—Dallas July 12, 2013, no pet.) (mem. op., not designated for publication).

Barradas acknowledges the evidence shows she formed a conspiracy with Carus and Cruz to rob Zeballos and Arvizu.

The evidence also shows Barradas was in the house when Arvizu was killed. Zeballos testified that Barradas came into the living room wearing a dark hoodie. She used pepper spray to blind Arvizu. Barradas and Cruz each held one of Arvizu's arms so that Carus could hit her in the head. Before hitting Arvizu, Carus looked to Barradas for direction. She nodded her head up and down and said "Now." Carus then "smashed in" Arvizu's head with a piece of metal. Arvizu subsequently died.

Based on our review of the record and viewing the evidence in the light most favorable to the jury's finding of guilt, we conclude the evidence is sufficient for a rational jury to find beyond a reasonable doubt that Barradas acted with the intent to promote or assist the commission of the offense and aided Cruz and Carus in the commission of the offense. *See* TEX. PENAL CODE. ANN. §7.02(a)(2).

Although Barradas asserts Zeballos's testimony was contradicted by other evidence and the jury could not have believed him, we defer to the jury and presume the jury resolved conflicts in the evidence in favor of the verdict. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 at 778. In her brief, Barradas concedes that if Zeballos's testimony were true, it "would provide sufficient evidence of aiding Carus to murder [Arvizu]." We agree.

We overrule Barradas's first issue. Because the evidence is sufficient to support her conviction as a party, we do not address Barradas's second issue. *See* TEX. R. APP. P. 47.1; *Sorto*, 173 S.W.3d at 472.

## B.  Penal Code Section 12.31

In her third issue, Barradas asserts the trial court erred by failing to inform prospective jurors about the application of Texas Penal Code section 12.31. *See* TEX. PENAL CODE ANN.

§ 12.31(b). Section 12.31(b) provides that when the State does not seek the death penalty in a capital felony trial, prospective jurors shall be informed that the State is not seeking the death penalty and that a sentence of life imprisonment without parole is mandatory if the defendant is convicted.

As an initial matter, Barradas did not lodge her objection in the trial court, and has waived this complaint for appeal. *See* TEX. R. APP. P. 33.1; *see also Smith v. State*, 420 S.W.3d 207, 214 (Tex. App.—Houston [1st. Dist.] 2013, pet. ref'd) (appellant must request trial court instruct venire pursuant to section 12.31(b) to preserve complaint for appeal).

Even if we were to conclude Barradas preserved this issue, we would conclude she was not harmed. *See Ford v. State*, 73 S.W.3d 923, 925–26 (Tex. Crim. App. 2002) ("Under our harmless error rule the violation of a mandatory statute does not, by itself, call for the reversal of a conviction."); *see also Murkledove v. State*, 437 S.W.3d 17, 27 (Tex. App.—Fort Worth 2014, pet. ref'd, untimely filed); TEX. R. APP. P. 44.2(b). When conducting a harm analysis of a jury-formation error, a court considers which right is protected by the statute. *Murkledove*, 437 S.W.3d at 27 (citing *Ford*, 73 S.W.3d at 925–26; *McCluer v. State*, No. 14–09–00058–CR, 2010 WL 1438957, at *9 (Tex. App.—Houston [14th Dist.] Apr. 13, 2010, pet. ref'd) (not designated for publication) (applying *Ford* to section 12.31(b) error)). The right protected by section 12.31(b) is the statutory right to have prospective jurors informed that the State is not seeking the death penalty and that a sentence of life imprisonment without parole is mandatory upon conviction of the capital offense. *See* TEX. PENAL CODE ANN. § 12.31(b). In jury-formation issues, the substantial right at issue is the ability to empanel only those jurors who are qualified to serve. *See Murkledove*, 437 S.W.3d at 27 (citing *Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007)). If an appellant does not present record evidence demonstrating the trial

court's error deprived her of a jury comprised of legally qualified jurors, she has not been harmed. *Id*.

Here, the trial court told potential jurors that Barradas was charged with the felony offense of capital murder and the "range of punishment for capital murder is life confinement in the Institutional Division of the Texas Department of Criminal Justice and up to a $10,000 fine can be imposed." The trial court also told potential jurors: "So we have capital murder, which is life confinement in the Institutional Division." The prosecutor then gave the venire a long explanation about sentencing in the case. The State noted that the trial court had explained the range of punishment. Additionally, the State explained, there are only two sentencing options when a person is found guilty of capital murder: the death penalty or "life without the possibility of parole." The prosecutor told the venire that the State was not seeking the death penalty in the case. Rather, if the jury found Barradas guilty, "that means the sentence will automatically be life without the possibility of parole."

After reviewing the record, we conclude the potential jurors received the information required by the statute—from the trial court and the State. Additionally, Barradas points to nothing in the record indicating the alleged error resulted in the empaneling of unqualified jurors. *See id.*; *Smith*, 420 S.W.3d at 214; *McCluer*, 2010 WL 1438957, at *9.

We overrule Barradas's third issue.

## C.    Jury Charge

### 1.    *Acts Constituting Party Liability*

In her fourth issue, Barradas claims the trial court erred by failing to limit the statutory acts constituting party liability in the application paragraph of the jury charge. A defendant, upon request, is entitled to a narrowing of the specific statutory modes of conduct that constitute party liability—whether she solicited, encouraged, directed, aided or attempted to aid another

–9–

specified person to commit the offense. *Vasquez v. State*, 389 S.W.3d 361, 368 (Tex. Crim. App. 2012). "The failure to narrow the specific modes of party-liability conduct when properly requested is reversible error if the defendant has suffered actual harm to his rights." *Id.*

The jury charge states: "A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." At the charge conference, Barradas's counsel "request[ed] that the State be forced to select the manner and means in which my client is an alleged party to any offense." She "specifically object[ed] to soliciting, encouraging, directing." The trial court concluded each of these actions was raised by the evidence and overruled the objection. We agree each of these actions was raised by the evidence.

The modes for party liability are not statutorily defined. Barradas does not provide any suggested definitions for the terms soliciting, encouraging, and directing; the State argues dictionary definitions should apply. "[T]erms not legislatively defined are typically to be understood as ordinary usage allows, and jurors may thus give them any meaning which is acceptable in common parlance." *Medford v. State*, 13 S.W.3d 769, 771–72 (Tex. Crim. App. 2000). We may look to a dictionary to determine common usage. *See, e.g., Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011); *Ramos v. State*, 303 S.W.3d 302, 307 (Tex. Crim. App. 2009).

As relevant here, Webster's Third International Dictionary defines "encourage" to mean "to spur on: STIMULATE, INCITE." WEBSTER'S 3RD NEW INT'L DICTIONARY 747 (1981). To "direct" means "to regulate the activities or course of . . . to guide and supervise." *Id.* at 640. *See also Washington v. State*, 449 S.W.3d 555, 569 (Tex. App.—Houston [14th Dist.] 2014, no

pet.) (citing dictionary definitions of direct and encourage). "Solicit" means "to move to action; serve as an urge or incentive to: INCITE." *Id.* at 2169.

Based on the evidence presented, a reasonable juror could infer that Barradas solicited, encouraged, or directed Cruz and Carus to commit the offense. Zeballo testified that Cruz and Carus looked to her for direction. Carus only hit Arvizu after she told him "Now." This evidence was sufficient to raise the issue about whether Barradas incited, guided, supervised, and moved her fellow participants to action.

We overrule Barradas's fourth issue.

2.      *Reasonable Doubt*

In her fifth issue, Barradas asserts the trial court erred by including a definition of reasonable doubt in the jury charge. Barradas objects to the following language: "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt."

We rejected this argument in *O'Canas v. State*, 140 S.W.3d 695, 700–02 (Tex. App.—Dallas 2003, pet. ref'd), and have done so on many occasions since then. *See, e.g., Washington v. State*, No. 05-14-00604-CR, 2015 WL 4178345, at *7 (Tex. App.—Dallas July 10, 2015, no pet.) (not designated for publication) (collecting cases). Furthermore, the Texas Court of Criminal Appeals has concluded that a trial court does not abuse its discretion by giving this same instruction. *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010) (citing *Woods v. State*, 152 S.W.3d 105, 114–15 (Tex. Crim. App. 2004)). We overrule Barradas's fifth issue.

## C. Trial Court's Jurisdiction

In her final issue, Barradas argues the trial court lacked jurisdiction to hear the case and render judgment because the case was not transferred to its docket. Barradas did not raise this issue in the trial court, and she concedes in her brief that the case law authority is against her argument because the issue must be raised in the trial court or it is waived.

We also have considered and rejected this argument on numerous occasions. *See, e.g., Reese v. State*, No. 05-14-00836-CR, 2015 WL 3814352, at *1 (Tex. App.—Dallas June 18, 2015, no pet.) (mem. op., not designated for publication); *Goff v. State*, No. 05-13-00876-CR, 2014 WL 259668, at *5 (Tex. App.—Dallas Jan. 22, 2014, no pet.) (mem. op., not designated for publication); *McCuin v. State*, No. 05-12-01148-CR, 2013 WL 3929215, at *1 (Tex. App.—Dallas July 26, 2013, no pet.) (not designated for publication). In those situations when a transfer order is necessary, the fact that a transfer order does not appear in the record is a procedural matter, not a jurisdictional one. *Lemasurier v. State*, 91 S.W.3d 897, 899 (Tex. App.—Fort Worth 2002, pet. ref'd). As a result, the absence of a transfer order does not render the actions of the transferee trial court void, but rather, subject to a plea to the jurisdiction. *Id.* at 900–01. A defendant who fails to file a timely plea to the jurisdiction waives the right to complain about the absence of a transfer order on appeal. *See id.* Barradas did not file a plea to the jurisdiction. We overrule Barradas's sixth issue.

CONCLUSION

We affirm the trial court's judgment.

/Craig Stoddart/
_____
CRAIG STODDART
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
141271F.U05

–12–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RUTH BARRADAS, Appellant

No. 05-14-01271-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1263141-U.
Opinion delivered by Justice Stoddart.
Justices Fillmore and Richter participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 20th day of October, 2015.